279 So.2d 749 (1973)
Kermit WURZLOW et al.
v.
PLACID OIL COMPANY.
No. 9221.
Court of Appeal of Louisiana, First Circuit.
May 29, 1973.
Rehearing Denied July 5, 1973.
Writ Refused September 7, 1973.
*751 E. Harold Saer, Jr., New Orleans (Chaffe, McCall, Phillip Toler & Hopkins), New Orleans, Kenneth Watkins (Watkins, Watkins & Walker), Houma, Armand Gutierrez, Dallas, Tex., for appellants.
John McCollam and Blake Arata, New Orleans (Gordon, Arata & McCollam), New Orleans, Edmund McCollam, Houma, for appellee.
Before SARTAIN, BLANCHE and WATSON, JJ.
BLANCHE, Judge.
Plaintiffs, Kermit Wurzlow and his assignees (hereinafter collectively referred to as "Wurzlows"), instituted a declaratory judgment action on March 23, 1965, against defendant, Placid Oil Company (hereinafter referred to as "Placid"), seeking to be recognized as owners of a one forty-eighth overriding royalty interest in certain enumerated oil, gas and mineral leases involving lands situated in the "Lapeyrouse Field" in Terrebonne Parish, Louisiana. By supplemental and amended petition filed on November 6, 1970, the Wurzlows asked that Placid additionally be ordered to account to them for all monies and interest thereon attributable to the claimed overriding royalty interests, dating from the respective first dates of production. Judgment was rendered by the trial court in favor of the Wurzlows, from which judgment Placid perfected this suspensive appeal.
Placid's first specification of error is that the trial court erred in admitting parol *752 evidence to supply an allegedly completely inadequate or missing description of lands in an instrument affecting real property, since the term "Lapeyrouse Prospect" which is used in an August 16, 1949, letter agreement allegedly does not describe any lands which can be identified or located on the ground. The body of the August 16, 1949, letter agreement, which forms the basis of this suit, reads as follows:
 August 16th, 1949
 Re: Lapeyrouse Prospect
 Terrebonne Parish
 File No. 15,876
Mr. Kermit Wurzlow
Houma, Louisiana
Dear Mr. Wurzlow:
Please refer to Mr. Frank Babcock's letter of August 2nd regarding
your override on our leases on the Lapeyrouse Prospect.
The letter of August 30th, 1948, addressed to you and Mr. McDermott
and signed by Mr. H. L. Hunt, President of Placid Oil Company, sets out
our agreement regarding the new leases taken and covering lands assigned
to us by British-American Oil Producing Company and Mr. McDermott on
August 30th, 1948.
This letter is written for the purpose of clarifying our oral agreement
regarding your override on new leases taken on the Lapeyrouse Prospect.
Also, we think it is good business practice to have such agreements in
writing.
We understand that you are to have a one forty-eighth (1/48th) overriding
royalty on any new leases taken by us on the Lapeyrouse Prospect except
leases from the Louisiana Land and Exploration Company and leases
from the State of Louisiana.
If the new leases are not full interest leases, your 1/48th override will be
reduced in the proportion the outstanding interest bears to the interest
covered by the lease.
If this is your understanding of our agreement, please indicate by signing
and returning a copy of the letter.
 Yours very truly,
 PLACID OIL COMPANY
 By (signed) W. F. Dalton
 W. F. Dalton
BBB:WFD:JR
Signed this 24th day of August, 1949
(signed) Kermit Wurzlow
 Kermit Wurzlow
Placid's second specification of error is that after admitting parol evidence, the trial court erred in holding that the parties to the 1949 letter intended the term "Lapeyrouse Prospect" to be an area of uncertain limits rather than a limited geographical area which, once established, did not change in size and included only the area in which Wurzlow was employed by Placid to purchase leases.
*753 Placid's third specification of error is essentially related to the first and second specifications of error and is that the trial court erred in holding that Placid was obligated to convey to Wurzlow an overriding royalty on leases acquired by Placid and covering lands in Township 20 South, Range 17 East, on which Placid's alleged Dulac Prospect was located.
As a result of the trial judge's excellent reasons for judgment, our disposition of a difficult matter on appeal has been made an easy task. We are satisfied that he disposed of all three of these arguments correctly, and the following excerpts from his Written Reasons for Judgment are reproduced here with approval:
"Plaintiffs' claim to the overriding royalty in question is based on a letter agreement dated August 16, 1949, photocopy of which is attached to plaintiffs' petition as Exhibit B and introduced into evidence as Wurzlow Exhibit No. 16, which was signed by the president of defendant company, W. F. Dalton, and which purports to reduce to `writing' and to `clarify' an oral agreement between plaintiff, Kermit Wurzlow, and the defendant, with respect to an overriding royalty to be transferred to Mr. Wurzlow in leases to be acquired by defendant on the `Lapeyrouse Prospect,' Terrebonne Parish. Essentially, the letter recites that Kermit Wurzlow was entitled to receive from Placid
"a one forty-eighth (1/48) overriding royalty on any new leases taken by us on the Lapeyrouse Prospect except leases from the Louisiana Land and Exploration Company and leases from the State of Louisiana.'
"Significantly this letter, which was prepared by defendant and signed by its president for the express purpose of confirming a prior agreement, neither attached a plat outlining the area of the `Lapeyrouse Prospect' nor did it purport to further describe said area by any other description.
"The central point of the controversy between plaintiffs and defendant revolves around the meaning to be accorded the term `Lapeyrouse Prospect' for purposes of enforcing the obligation undertaken by defendant to transfer to plaintiffs' predecessor in title a one forty-eighth (1/48th) overriding royalty interest on leases acquired by defendant on the `Lapeyrouse Prospect'.
"Plaintiffs contend that the override is owed by defendant on all leases acquired by defendant covering lands which lie within the exterior surface boundaries of the producing units ultimately created by the Louisiana Department of Conservation for various producing sands designated by the Department of Conservation as being in the Lapeyrouse Field of Terrebonne Parish, Louisiana. Plaintiffs' position is that the word `prospect', as used by the parties in the 1949 Letter Agreement and as understood in the oil and gas industry, denotes the entirety of a geologically promising area, thought to be prospective of commercial oil and gas deposits, which is ultimately proved to be productive by exploratory and development drilling. Applying that definition of the word `prospect' plaintiffs aver that as additional drilling defined the producing limits of the oil and gas sands overlying the salt dome or mass at Lapeyrouse, which all technical witnesses testified was the principal geological anomaly causing commercial accumulations of oil and gas in the Lapeyrouse area, and as Placid acquired leases covering the expanding productive area, plaintiffs became entitled to an overriding royalty on all leases so taken.
"Defendant, on the other hand, contends that the `Lapeyrouse Prospect', as used in the letter agreement, referred to a limited geographical area located primarily in the vicinity of the initial wells drilled in the Lapeyrouse Field and lying entirely within a square outlined in orange on a map * * *." *754 "FINDINGS OF CONTESTED FACT AND CONCLUSIONS OF LAW
"Substantively the decision in this case will turn on the meaning of the word `prospect' or `Lapeyrouse Prospect' as used in the above letter agreement. We note here that excepted from the agreement are any new leases taken from the Louisiana Land and Exploration Company and leases from the State of Louisiana. The term is of course a term of art, and its meaning must be determined from the context in which it is used. Philologically, it is formed from two Latin words `pro', meaning forward or ahead and `spicere' meaning to see or look. There are, of course, many shades of meaning attributed to the term, depending on the frame of reference in which it is applied; but from all of the evidence bearing on its meaning in the oil and gas industry, the literal translation of forward looking or looking to the future seems a quite proper basis on which to build a more technical and more accurate definition.
"Defendant's position in this area is that no parol evidence is admissible to vary the terms of a contract involving a real right. This court and the appellate courts of this state, by refusing to grant writs, have already held that the rights here involved are real rights.
"In Moore v. Hampton, 3 La.Ann. 192 (1848) the Supreme Court of Louisiana approved the use of parol evidence to `explain' ambiguities in a description. That ruling has been consistently followed and appears in detail in Walker v. Ferchaud, 210 La. 283, 26 So.2d 746, infra.
"Here the controversy is between the parties to the instrument; and the jurisprudence cited in brief dealing with the rights of third parties is inapposite.
"In Williams v. Bowie Lumber Co., 214 La. 750, 38 So.2d 729, the Supreme Court observed, with regard to such jurisprudence:
`... All of those cases involved the rights of third persons and they are authority only for the proposition that a sale with an omnibus description does not supply notice to third persons who acquire an adverse interest in the land.'
"Accordingly, we are of the opinion that we may look to parol evidence to determine, if possible, the meaning which must be given to the term `Lapeyrouse Prospect,' in the aforesaid letter agreement.
"Without discussing separately and in detail, the testimony of each witness who attempted to throw light on the subject or reconciling the nuances which each gave to the term, we have reached the conclusion that in the oil and gas industry, a prospect commences with the determination of the existence of a certain geological structure, conducive to the production of oil and gas underlying a certain area of land. The actual existence of such minerals must then be determined and confirmed by actual drilling and production of said minerals. The continued exploration and drilling of additional wells then determine the extent of the area underlain by the geological structure which originally formed the basis for the drilling of the first well or wells. When by drilling it is ascertained that the limits of the producing geological structure have been reached, then the whole area underlain by that structure becomes a `field'. From that, we conclude that a `prospect' contemplates, in its optimum aspect, the creation of a `field'.
"We feel justified in applying the optimum aspect because the evidence indicates the `prospect' eventually was productive (successful) and became a `field' known to persons in the industry, including the Louisiana Department of Conservation, as the Lapeyrouse Field.
"The Court itself claims no expertise on the subject of geology or geological exploration, but we see no reason why the conclusions of the Louisiana Department of Conservation, based on studies, reports, *755 and conclusions of its own geologists, in defining the limits of such a field should not be accepted. Especially since such limits must be established in order for us to determine whether the leases on which plaintiffs claim an override lie within the `field' contemplated by the `prospect.' For our purposes, since the field has been, at this date, explored and developed, the terms `prospect' and `field' are synonymous.
"We hold, therefore, that the letter agreement of August 16, 1949, prepared by defendant and accepted by plaintiff, Kermit Wurzlow, on August 24, 1949, entitles the latter (and his assigns) to the override stipulated therein, on all leases, except those acquired from the Louisiana Land and Exploration Company and from the State of Louisiana, bearing on lands located within or partly within the Lapeyrouse Field as defined by the Louisiana Department of Conservation. We advisedly use the phrase `partly within', since it was developed on the trial that it is often necessary to lease an entire tract in order to obtain a lesser amount of desirable acreage.
"For the reasons set out hereinbelow, the Court finds that the limited definition of the term `Lapeyrouse Prospect' contended for by defendant is not supported by either the law or the evidence adduced at the trial and that the term as used in the letter agreement of August 16, 1949, must be construed for purposes of determining the rights of the parties as covering and defining the entire area which now lies within the exterior boundaries of the producing units created by the Louisiana Department of Conservation for the producing sands defined by the Louisiana Department of Conservation as being situated in the Lapeyrous Field of Terrebonne Parish, Louisiana. The composite limits of this area are shown on Wurzlow Exhibit Nos. 15-U and W, reference to which is made for all purposes hereof.
"In reaching the above conclusion the Court has carefully considered the detailed testimony and other evidence adduced at the trial and has made the following pertinent findings of fact which the Court has attempted to set out in reasonable chronological sequence:
"1) In late 1947 or early 1948 defendant, Placid, became interested in acquiring oil, gas and mineral leases in the Lapeyrouse Area of Terrebonne Parish, Louisiana, based on a written recommendation made by Mr. Leslie Bowling, a then Placid representative, set out in a letter dated March 16, 1948, identified as Wurzlow Exhibit 21. (Tr. 98, 164-165 and 232-234).
"2) In Mr. Bowling's recommendation letter he (i) stated that the then available geological data indicated that the basic geological feature in the Lapeyrouse area causing his interests was a complex `structural ridge tending NW-SE' along a map accompanying the letter of recommendation (ii) that `several holes' would be necessary to `define the structure' and (iii) that the `prospect ... has possibilities below 13,000 feet are considerable'. Mr. Bowling in his testimony at the trial further admitted that at this time the delineation of the structure at deeper depths was uncertain and `open ended' to the west. (Tr. 164-167, 171-174). Additionally, all technical witnesses who testified for both plaintiffs and defendant identified this structure or uplift as the predominant geological feature influencing the entrapment and accumulation of oil and gas in the Lapeyrouse Field. (Tr. 18, 30-31, 165-174, 233-234)
"3) Based on Mr. Bowling's recommendation Placid's management, in late 1948 or early 1949, decided to acquire certain existing oil and gas leases then held by British American Oil Company, to purchase renewals of certain of the British American leases which were about to expire and to purchase certain additional leases on other lands not covered by the British American leases. In connection with this decision, Mr. W. F. Dalton, Placid's President, testified that Placid's objective was to extend the producing limits of the small Lapeyrouse *756 Field as it then existed, particularly as to deeper depths. (Tr. 233-235)
"4) Once the election was made to acquire the British American leases it was important, in the view of Placid's management, that it immediately begin to acquire renewal leases and new leases as quickly as possible before competitor companies moved into the area. (Tr. 98, 232-235 & Babcock Deposition, pp. 11-44)
"5) Because of its desire to move as quickly as possible Placid's management, acting through its representative, Mr. Frank Babcock, retained the services of Mr. Kermit Wurzlow, an oil and gas lease broker by profession, and one of the plaintiffs herein, to assist it in acquiring said leases. (Tr. 259, 271 & Babcock Deposition, pp. 39-41)
"6) Mr. Wurzlow was retained by defendant because of the advantage which Placid knew Mr. Wurzlow enjoyed over other contract oil and gas brokers in Terrebonne Parish generally, and in the Lapeyrouse Area in particular. In this connection, the evidence shows, that Mr. Wurzlow, and his father, Frank Wurzlow, had worked primarily in Terrebonne Parish and had developed relationships with prospective lessors not enjoyed by other brokers. Moreover, the Wurzlows had done extensive prior work in the Lapeyrouse Area and as a consequence had at their disposal much of the required basic title information, all of which was made available to Placid to assist it in the expeditious acquisition of its initial leases in the Lapeyrouse Area. (Tr. 96-97 & Babcock Deposition pp. 39-41)
"7) The arrangement with Mr. Wurzlow, which was subsequently confirmed by defendant's President, Mr. Dalton, in the Letter Agreement of August 16, 1949, was negotiated with Mr. Wurzlow by Mr. Frank Babcock, a then employee of defendant, who recommended that Mr. Wurzlow be hired because he `was aware that he was a good man and that he was familiar with that particular part of Terrebonne Parish; that he knew the people and that they loved his daddy before him and that he also was a competent man and they liked him at the time.' Mr. Babcock first attempted to retain Mr. Wurzlow's services on the basis of a cash commission, but Mr. Wurzlow refused to work for Placid on that basis alone, and requested that defendant also agree to give him a 1/48th overriding royalty in all leases subsequently acquired by the defendant in the Lapeyrouse area, whether purchased by defendant directly or by Mr. Wurzlow for defendant's account. (Tr. 97-98 & Babcock Deposition pp. 12-13, 39-41 & 55)
"8) Mr. Wurzlow and his father had customarily made arrangements of this kind with other companies in other areas of Terrebonne Parish, such as for example the North Houma Area, where, under an arrangement with Union Oil of California, negotiated prior to the arrangement made with Placid at Lapeyrouse, the Wurzlow family has, over a 15 year period, been transferred overriding royalties on all new leases acquired by Union Oil of California as the productive limits of the North Houma Field were expanded by exploratory drilling. (Tr. 99, 101, 105, 221-224 & Babcock Deposition p. 37)
"9) Mr. Babcock, in behalf of Placid, agreed to the terms requested by Mr. Wurzlow and agreed that Mr. Wurzlow would be entitled to receive a 1/48th overriding royalty interest on all leases acquired by Placid on the Lapeyrouse Prospect whether purchased directly by Placid or by Mr. Wurzlow for the account of Placid. At the time he made the aforesaid agreement with Mr. Wurzlow, Mr. Babcock, who testified as defendant's witness, was specifically aware of the type arrangement the Wurzlows had with Union Oil Company of California in the North Houma Field identified in Finding 8 above inasmuch as Mr. Babcock had worked for Union Oil Company of California at the time and had recommended that Mr. Wurzlow and his father be retained for said job. Mr. Babcock *757 in his testimony also acknowledged that the arrangement made with Mr. Wurzlow at Lapeyrouse was similar to the arrangement made in the North Houma Field with Union Oil of California. (Tr. 99, 101, 105 & Babcock Deposition p. 37)
"10) The oral agreement entered into between Mr. Wurzlow and Mr. Babcock was reduced to writing by Placid at the request of Mr. Babcock and was finalized in writing in the August 16, 1949, Letter Agreement which is the basis of plaintiffs' claim herein. (Tr. 103, 194-196, 248-249, 276-280).
"11) Neither at the time of the original agreement made between Mr. Wurzlow and Mr. Babcock, nor at the time of the execution of the August 16, 1949, Letter Agreement did Mr. Babcock, or any other employee or representative of Placid, delineate for Mr. Wurzlow a specific and limited geographical area which was considered by Placid to comprise the Lapeyrouse Prospect. (Tr. 103-104)
"12) No plat depicting the `Lapeyrouse Prospect' was attached to the Letter Agreement of August 16, 1949, as is apparently common in the oil and gas industry when specific limits are to be fixed in which a broker's rights are to apply. Nor was any such plat ever shown to Mr. Wurzlow outlining the Lapeyrouse Prospect. (Tr. 103-104)
"13) In an earlier unexecuted draft of the August 16, 1949, Letter Agreement Placid's management considered fixing definite limits to the Lapeyrouse Prospect by defining same to include any new leases taken at Lapeyrouse by Placid lying within `one mile' of any acreage covered by the existing leases acquired from British American Oil Company, but those limits were deleted from the executed letter agreement by Placid's management without consultation with Mr. Wurzlow. Placid's secretary, Mr. Barber, who drafted the executed letter, admitted in his testimony that this deletion rendered the limits of the prospect uncertain. (Tr. 279)
"14) The Letter Agreement of August 16, 1949 was prepared entirely by Placid and submitted to Mr. Wurzlow for his signature. Mr. Wurzlow was not consulted concerning changes made in prior drafts nor did he in any way participate in the preparation of the said letter agreement. (Tr. 103-104, 194-196, 248-249, 276-280)
"15) The orange square drawn on the map given by Placid to the Wurzlows in 1963 and represented by Placid at that time to represent the limits of the Lapeyrouse Prospect as envisioned by Placid at the time the initial agreement was made with Kermit Wurzlow could not have fixed the limits of the Lapeyrouse Prospect as between Mr. Wurzlow and Placid in 1948 and 1949 because that square area did not come into existence until 1957 at which time the square was drawn to fix the limits of that portion of the Lapeyrouse Field which was to be covered by a Gas Purchase Contract to be executed between Placid and United Gas Pipeline Company. (Tr. 186, 199)
"16) Following the confection of the agreement between Mr. Babcock and Mr. Kermit Wurzlow in 1949, Mr. Wurzlow immediately went to work for Placid and assisted them in acquiring numerous oil and gas leases in the Lapeyrouse Area. Mr. Wurzlow continued to work for Placid assisting it in acquiring such leases for a period of some ten (10) years or until 1959 following which time Placid apparently elected to cease using his services. (Tr. 110, 147 and 161)
"17) The present producing area of the Lapeyrouse Field included within the boundaries of the producing units created for sands located in the Lapeyrouse Field by the Louisiana Department of Conservation was developed in stages over the period from 1949 through 1964 and as the producing limits of the field developed, Placid continued to buy additional leases covering land in new areas indicated to be productive by exploratory drilling. (Tr. 26-69, 187-193)
*758 "18) The first series of leases acquired by Placid in 1948 and 1949 were located primarily in the general vicinity of the Dupont Well located in Section 15, T-20-S, R-18-E, near Bayou Terrebonne. (Tr. 104-106, 208-211)
"19) Following its initial acquisition of leases Placid drilled an unsuccessful well on these initial leases and lost some interest in the area until additional seismic work was done in the early 1950's leading to the acquisition of a few additional leases and the drilling of a well in 1953 which indicated the probability of deeper production on the Lapeyrouse structure south and west of the existing small shallow production. (Tr. 208-211)
"20) Based on the 1953 drilling, Placid acquired a series of leases south of the original well but still located more or less west of Bayou Little Caillou. Mr. Kermit Wurzlow assisted in the acquisition of these leases. (Tr. 101-110, 149-150, 208-211)
"21) Additional drilling done in 1955 and 1956 indicated that the productive limits of the Lapeyrouse structure was developing toward the west and Placid bought additional leases at this time extending out to the 40 arpent line lying west of Bayou Little Caillou. Mr. Kermit Wurzlow assisted in the acquisition of these leases. (Tr. 146-150 & Wurzlow Exhibit 44-50)
"22) Thereafter, in late 1959 and 1960 Placid continued to drill additional step-out wells which indicated that the basic Lapeyrouse structure and the producing sands associated therewith extended west of the 40 arpent line from Bayou Little Caillou and additional leases were acquired by Placid in this area. Mr. Wurzlow was not requested to participate in the acquisition of these leases. (Tr. 39-50 & 187)
"23) Placid has recognized the Wurzlows' override did attach to all step-out leases acquired by Placid during the period 1948-1959 extending out to the 40 arpent line west of Bayou Little Caillou, but refuses to concede that said override attached to the leases acquired in the additional expansion area west of said 40 arpent line during the period 1960 forward. It is these leases primarily to which this suit pertains. (Wurzlow Exhibit 16 & Tr. 191)
"24) The Louisiana Department of Conservation classifies a producing pool or reservoir as being in a particular field if it reaches the conclusion that the particular accumulation of oil or gas is caused by or associated with the principal geological feature or structure which caused or influenced the entrapment of other sands in the same field. The composite exterior boundaries of those Lapeyrouse Field producing units created for said sands by the Department of Conservation are shown on Wurzlow Exhibit Nos. 15 U and W and are capable of location on the ground by an appropriate survey. (Tr. 14, 27-28 & 37)
"25) Placid contends that the Lapeyrouse Prospect as conceived by it in 1948 and 1949 had firmly fixed geographical limits recognized by all parties but the record indicates that Placid itself, as late as 1957, was uncertain as to the intended limits of the Lapeyrouse Prospect and considered asking Mr. Wurzlow to execute a letter agreement with an attached plat specifically outlining the exact area of the prospect. This suggestion, made by Placid's employee Mr. C. H. Petry, was rejected by Placid's management on the ground that `Mr. Wurzlow would [be] skeptical if we should ask him to sign a supplemental agreement form eight years after the original agreement was signed and without any specific reason for the request.' (Wurzlow Exhibit 26 & 27, Tr. 195-198)
"26) Mr. Wurzlow was never requested by Placid to consider executing such supplemental agreement. (Tr. 195-198)
"27) None of the leases on which plaintiffs contend they are entitled to an overriding royalty, which are identified as Exhibits *759 V-1 through V-172, are located within the producing units created by the Department of Conservation for the Dulac Field of Terrebonne Parish which lies north and west of the Lapeyrouse Field and all of these leases have been acquired and/or maintained by Placid because they overlie producing sands located in the Lapeyrouse Field of Terrebonne Parish, which were discovered and defined as the Lapeyrouse structure was developed to the west of Bayou Little Caillou. (Wurzlow Exhibit W and Tr. 65)
"28) Defendant failed to prove by specific and competent evidence that any of the leases listed on Wurzlow Exhibit V and identified as Wurzlow Exhibits V-1 through V-172 were renewals of old British American leases or that the overriding royalty due under any said leases was paid on same as they became due.
"29) Mr. Kermit Wurzlow at no time actively competed with Placid in attempting to purchase oil and gas leases on the Lapeyrouse Prospect at any time while Mr. Wurzlow's services were being utilized by Placid. Mr. Wurzlow did, in 1960, after Placid had ceased using his services, buy three (3) specifically identified leases, ultimately acquired by Placid, which were initially acquired for the account of another oil company. There is no competent evidence in the record, however, showing that Mr. Wurzlow in any way competed with Placid in attempting to acquire other leases in the area shaded in blue on the plat attached to plaintiffs' petition as Exhibit D and at no time did Mr. Wurzlow attempt to acquire any leases for his own account or for the account of others during the period of time that Placid continued to use Mr. Wurzlow's services. (Tr. 146-148)
"Based on the above findings of fact the Court has concluded that when Placid first obligated itself in 1948 and 1949 to transfer to Kermit Wurzlow an overriding royalty on new leases taken by it on the `Lapeyrouse Prospect', it was not the intention of the parties to define the area of the prospect by reference to definite geographic limits, as contended for by Placid. To the contrary, all of the evidence indicates that the parties considered the `Lapeyrouse Prospect' to be an area of uncertain limits potentially productive of oil and gas because of the presence of the deep-seated salt ridge or uplift at Lapeyrouse and that the producing limits of the prospective area had to be determined by exploratory wells yet to be drilled. And, when that occurred and the productive limits of the structure were determined and new leases were acquired on same, the obligation of Placid to transfer the agreed overriding royalty interest to the Wurzlows matured and should have been recognized.
"In this connection, the Court was impressed with the testimony of plaintiffs' expert geological witness, Mr. Ted J. Hoz, who ably demonstrated how the westward development of the Lapeyrouse structure had taken place on a step by step basis as new wells were drilled and the Court can see no reason for arbitrarily limiting the obligation of Placid to leases acquired by it out to the 40 arpent line lying west of Bayou Little Caillou. Mr. Wurzlow's override has been conceded by Placid to extend to those leases acquired in the development of the Lapeyrouse producing sands out to the aforesaid 40 arpent line during the period 1948-1959 and the Court can find no reasonable basis for concluding that the obligation to recognize the Wurzlow override should not continue with respect to those leases lying west of the 40 arpent line which were acquired by Placid during the period 1960 forward as the producing limits of the sands overlying the basic Lapeyrouse structure were extended westward to the present limits shown on Wurzlow Exhibit Nos. 15U and W. Mr. Babcock, the Placid representative who negotiated the basic contract with Kermit Wurzlow, was cognizant of the agreement made by Wurzlow with Union Oil of California in the North Houma Field and conceded in his *760 testimony that the agreement with Kermit Wurzlow at Lapeyrouse was similar to the agreement made with Union Oil of California at North Houma.
"The Court is further bolstered in the above conclusion by the fact that the three (3) highly qualified professionals testifying for plaintiffs, Messrs. Ted J. Hoz, William W. Allen and A. P. Scott, all having considerable experience in the oil and gas business, uniformly testified that the term `prospect' is a term which has descriptive significance in the oil and gas business generally and to them meant an area thought to be potentially prospective of oil and gas the precise limits of which had to be defined by subsequent exploratory drilling. Representative of this testimony is that given by Mr. W. W. Allen, who had twelve (12) years of experience as a landman for Shell Oil Company and is presently the manager of Gulf Coast operations of LVO Corporation, an oil company active in South Louisiana. When asked his definition of a prospect Mr. Allen replied:
`A. A prospect is a geological idea which is uncertain in its size and conformity and is based upon some technical information seismic, gravity or subsurface information, which is capable of being made certain by drilling.' (Tr. 182-183)
And when asked what his interpretation of the August 16, 1949, Letter Agreement would be based on his aforesaid definition of a prospect, Mr. Allen responded:
`A. It would be my opinion that the company would owe the broker a 1/48th overriding royalty on the proceeds therefrom on the Lapeyrouse Prospect as it has been defined in drilling as the Lapeyrouse Field' (Tr. 182-183)
"As stated above the Court agrees with that analysis both because the evidence indicates that this was the intent of the parties and because the term `prospect' does apparently have that connotation to men active in the oil and gas industry. And, under Article 1947 of the Civil Code, the Court, in interpreting contracts, is bound to give technical terms the meaning accorded it by persons familiar with the particular business. That article reads as follows:
`Terms of art or technical phrases are to be interpreted according to their received meaning with those who profess the art or profession to which they belong.' [Emphassi supplied]
"The aforementioned definition of the term `prospect' is also in keeping with the only cases found by the Court which even touch upon the question of the meaning of the word `prospect' when used in the mining industry. In the case of Montana Ry. Co. v. Warren, 137 U.S. 348 [11 S.Ct. 96, 34 L.Ed. 681] (1890) the United States Supreme Court was concerned with the question of whether a `prospect' relative to hard minerals had a market value, as opposed to a question as to the real extent of same. The Court, however, in answering that question was clearly of the opinion that a `prospect' was in essence an `undeveloped mine', the extent of which, and therefore the value, is unknown until full development occurs. The following language is pertinent, viz:
'That this mining claim, which may be called "only a prospect," had a value fairly denominated a "market value," may, as the supreme court of Montana well says, be affirmed from the fact that such prospects are the constant subject of barter and sale. Until there has been full exploiting of the vein, its value (the prospect) is not certain, and there is an element of speculation, it must be conceded, in any estimate thereof. And yet, uncertain and speculative as it is, such prospect has a market value.' 137 U.S. at 352, 353 [11 S.Ct. 96]. [Emphasis supplied]
And in a prior opinion rendered in the same case by the Montana Supreme Court, the Court there considered a `prospect' to *761 be an undeveloped mine. The following language is pertinent:
`Has a "prospect"an undeveloped mine any market value? A full, positive answer to that is that prospects are sold in the market every day.' [6 Mont. 275] 12 P. [641] at 643
And further:
`So with a "prospect". It certainly has value in the market. What is the characteristic of the prospect? If ore had been found, that fact is an element of value. It is the "fertility" of that piece of property. The value will increase as the prospect becomes more fully developed...' 12 P. at 643 [Emphasis supplied]
"Just as in the area of hard minerals the definition of the limits of the prospect must await the full development of the prospective area, which becomes the developed vein or mine, the Court believes that in the area of oil and gas the prospect must likewise be considered an undeveloped prospective area of uncertain limits the precise limits of which will be determined by drilling.
"In reaching the foregoing conclusions concerning the meaning to be accorded the term `Lapeyrouse Prospect' in interpreting the 1949 Letter Agreement, the Court is not unmindful of the fact that several of defendant's expert witnesses testified that the term prospect to them meant an area of fixed geographical limits generally covering all of the area the management of a company decides must initially be acquired to support a drilling venture. The Court was not impressed with this testimony, however, particularly in view of the fact that Placid at Lapeyrouse acquired its leases in several stages and in different areas as the Lapeyrouse Field developed westward.
"But conceding, arguendo, that some persons in the oil and gas business may consider a prospect to comprise such a limited specific area, it is plain that toher qualified members of the industry, such as for example plaintiffs' witnesses, Messrs. Hoz, Scott and Allen, hold the opposite view. That being true, the term `prospect' standing alone and unexplained is at worst ambiguous and under the established rules of contract construction prevailing in Louisiana the 1949 Letter Agreement must be construed against Placid and in the fashion most favorable to the Wurzlows.
"That result necessarily follows because the letter agreement was prepared entirely by Placid and signed by its president for the express purpose of clarifying a prior verbal agreement and because the ambiguity, if one there is, resulted from Placid's failure to explain and define its definition of `Lapeyrouse Prospect'. Articles 1957 and 1958 of the Louisiana Civil Code are in point, viz:
`Art. 1957. In a doubtful case the agreement is interpreted against him who has contracted the obligation. (As amended by Acts 1871, No. 87)'
`Art. 1958. But if the doubt or obscurity arise for the want of necessary explanation which one of the parties ought to have given, or from any other negligence or fault of his, the construction most favorable to the other party shall be adopted, whether he be obligor or obligee.'
"The jurisprudence under these articles has consistently applied certain basic tenets of contract interpretation which here, even if the Court had not made the above specific findings concerning the meaning of the term `Lapeyrouse Prospect', would compel construction of the 1949 Letter Agreement most favorably to the Wurzlows and against Placid.
"The first of these rules is that ambiguous contracts are always construed against the party who prepared same. The following language taken from Holloway Gravel Co. v. McKowen, 200 La. 917, 9 So.2nd 228, 233 (1942), where the Court was concerned *762 with the question of whether a reservation of `minerals' included sand and gravel, is representative of the general rule:
`The reservation was prepared by W. Carruth James, acting for himself and his co-owners, and if there is obscurity in the clause so far as the use of the word "mineral" is concerned, a construction most favorable to McKowen, the other party to the contract, must be adopted. Civ.Code Art. 1958.' [Emphasis supplied]
"Also in point is Kemp v. Beasley, 188 So.2d 425, 427 (La.App.3rd Cir.1966) where the Court, in construing an allegedly ambiguous mineral deed, stated the general rules of contract construction as follows:
`Every effort must be made to gather the intention of the parties from the written instrument itself, but where this is impossible, extrinsic evidence may be resorted to. Texaco, Inc. v. Vermilion Parish School Board, 244 La. 408, 152 So.2d 451 (1963). Where the language of a contract is doubtful or ambiguous we must endeavor to ascertain the true intention of the parties. LSA-C.C. Article 1950. In case of doubt, the agreement must be interpreted against him who prepared it. Schreiner v. Weil Furniture Co. [La.App.], 68 So.2d 149 and the authorities cited therein; LSA-C.C. Article 1957. If the doubt or obscurity results from the lack of any explanation which one of the parties should have given or from any other neglect or fault of his, the construction most favorable to the other party shall be adopted. LSA-C.C. Article 1958; Hood v. Home Enterprise, Inc., La.App., 159 So.2d 55; Bruno v. McCabe, La.App., 71 So.2d 245.' [Emphasis supplied]
And further:

`It is clear that plaintiff is the one who prepared the instrument and any fault or neglect resulting in doubt or ambiguity lies with him. Under the above cited jurisprudence, the contract must be construed against him.' [188 So.2d at 428Emphasis supplied]
"Application of the above authorities to the 1949 Letter Agreement clearly requires that any latent ambiguity in the word `prospect' must be construed against Placid and in favor of the Wurzlows.
"It should also be observed that in the 1949 Letter Agreement the obligation to transfer the overriding royalty to Kermit Wurzlow was an express undertaking by Placid and it is also the law that an ambiguous contract is construed against the party who has contracted the obligation and failed to explain the limit of said obligation.
"A good example of the application of this rule is Hoover v. Miller, 6 La.Ann. 204-206 (1851) where the following language appears:
`The word partially, made use of by the plaintiff, standing as it does unexplained, cannot affect the contract to the prejudice of the defendant. The rule is, that in doubtful cases the agreement is interpreted against him who has contracted the obligation, and that if, as in the present case, the doubt or obscurity arise for the want of necesary explanation which one of the parties ought to have given, or from any other negligence or fault of his, the construction most favorable to the other party shall be adopted. C.C. 1952, 1953.

`It was incumbent upon the plaintiff to have explained what he meant by a partial agreement; and as he has not done so, the law presumes that the explanation, if given, would have been to his disadvantage, and that there is nothing in this ambiguous expression that can diminish or affect his liability under the contract.' [Emphasis supplied]
Also in point is Mayronne and Sons v. Eddy and Sons, 6 La.App. 712, 714 (Or. 1927).
*763 "Also in point is Weems v. International Automobile Insurance Exchange, 159 So.2d 321, 323 (La.App.2nd Cir. 1963) where the rule is succinctly stated as follows:
'In a doubtful case, a general rule prevails that the agreement is interpreted against the one who contracted the obligation. LSA-C.C. Art. 1957.' [Emphasis supplied]
"Placid takes the position that by use of the term `prospect' it intended to define a specific area having fixed geographic limits, but if that was its intent it was incumbent on Placid to spell out the limits in the agreement by reference to a plat or other appropriate descriptive limits. And, having failed to do so, despite having given specific consideration to fixing such limits as one mile from the British American leases, Placid must bear the burden of any resulting ambiguity."[1]
"Reduced to its essence defendant's argument based on the parol evidence rule is that the term `Lapeyrouse Prospect' is meaningless insofar as it purports to vest in plaintiffs a right to acquire an interest in any particular leases in the Lapeyrouse area because the phrase does not in and of itself describe a specific area and cannot be explained by parol evidence. The Court disagrees.
"As the Court found in its judgment of April 3, 1967, overruling defendant's exception of improper venue, the Letter Agreement of 1949, in referring to leases in the `Lapeyrouse Prospect,' obviously meant to describe the land on which the leases would bear by terms of descriptive significance to and understood by both parties. After hearing all of the evidence adduced at the trial the Court is further confirmed in that finding.
"In the first place defendant has admitted, both in testimony and brief, that based on the very same letter agreement here in dispute, it did over the period from 1949 and into 1959, recognize its obligation and conveyed to plaintiffs an overriding royalty on numerous oil, gas and mineral leases acquired by defendant at Lapeyrouse located within the area of the prospect as now defined by defendant. Thus defendant cannot say that the term `Lapeyrouse Prospect' had no meaning because defendant itself has recognized the letter agreement as a sufficient written expression of a legal obligation to transfer to plaintiffs title to overriding royalties on leases which it now considers to be within the area of the prospect.
"Obviously, therefore, the dispute between plaintiffs and defendant does not relate to the total omission of words of descriptive significance from the letter agreement, but rather involves a question of the correct interpretation of the words of descriptive significance which defendant itself chose to assert in the written agreement which forms the basis of plaintiffs' claim. Moreover, even defendant's own expert witnesses, Messrs. Dalton, Bercegeay and Main, admitted that the term had an accepted connotation in the oil and gas industry albeit they disagreed with plaintiffs' witnesses as to the substance of that connotation. In this connection see Article 1947 of the Louisiana Civil Code discussed supra.
"Based on the foregoing analysis the Court has concluded that parol evidence was properly admitted to explain the meaning of the term `Lapeyrouse Prospect' as used in the 1949 Letter Agreement. And based on that evidence, for all of the reasons expressed hereinabove, the Court has concluded that the letter agreement obligated *764 defendant to transfer to plaintiffs an overriding royalty on each and every lease acquired by Placid in the course of developing the `Lapeyrouse Prospect' into the area overlying the proven unitized producing sands which the Louisiana Department of Conservation has recognized as lying within the Lapeyrouse Field. The latter area, as defendant's own expert civil engineer, William Clifford Smith, testified, is an area that can be and has been surveyed on the ground. (Tr. 215-218)
"The Court feels that this is a clear situation justifying application of the general rule that as between the parties to a deed or instrument parol evidence is admissible to explain terms of obvious descriptive significance to the parties using same.
"A case representing application of the general rule is D'Aquin v. Barbour, 4 La. Ann. 441 (1849), which involved a controversy over the extent of the premises described in a written lease as the `Union Bakery'. In approving the use of parol testimony to establish the exact description of the property leased, Justice Slidell said:
`We have no hesitation in saying that, parol evidence was properly received by the court below, for the purpose of showing the nature and distribution of the property which forms the subject of the controversy. The property was described in the introductory clause of the lease, as the premises now and heretofore occupied by Barbour, as the `Union Bakery,' situated on New Levee Street, and extending through to Commerce street; and for the purpose of ascertaining the nature of the subject, parol evidence to show what premises were then, and had been theretofore, occupied as the Union Bakery, was proper and even necessary. The intention of the parties was to be ascertained, and that intention could not be reached without an explanation of the situation and nature of the property.' 4 La.Ann. 443. [Emphasis supplied]
"The same general rule was applied in Moore v. Hampton, 3 La.Ann. 192 (1848) which involved a petitory action over the title to lands ambiguously described in the deed transferring same. In approving the use of parol testimony to `explain' the description the Court observed:
`Under our rule, the evidence is said to be against the act, when it is introduced to prove the falsity of what is therein stated. It is said to be beyond the act, if the object of it be to add to the act a clause which it does not contain. But when titles to land contain no specific description of the property conveyed, as in this case, the question of ownership can only be determined by the application of the title to the land, and by parol evidence. It is conceded that some land was mortgaged and sold with the sawmill. The evidence adduced for the purpose of identifying the thing sold, explains and elucidates the title, and goes neither against nor beyond it. The facts it establishes are analogous to those of extent and boundary. Dalloz, An. 1837, 1st part, p. 239.

`At common law, parol evidence is always admitted to ascertain the nature and qualities of the subject to which the written contract refers; and, while the controversy is between the original parties or their representatives, all contemporaneous writings relating to the same subject matter are legal evidence.' 3 La.Ann. 195 [Emphasis supplied]
"This general rule has been consistently applied in the later jurisprudence as is shown by Justice Hawthorn's well reasoned opinion in Walker v. Ferchaud, 210 La. 283, 26 So.2d 746, 747 (1946) where a contract to sell property described as `... 124 Stella Street, on grounds measuring about 60 × 150, as per title ...' was given effect, viz:
`We concede that the property which is the object of the contract is not sufficiently described in the written contract to identify it with certainty, but we think *765 the district judge erred in sustaining the exception in this case, for the reason that on a trial of the case on its merits parol evidence is admissible for the purpose of making such identification.

`It is true that parol evidence is not admissible against or beyond what is contained in the contract to purchase, nor is it admissible to show what may have been said before, or at the time of making it, or since. But this rule has no application to the admissibility of parol evidence to identify land not specifically described in an act of sale or contract to purchase or sell, for this court, as far back as 1848, in the case of Moore v. Hampton, 3 La.Ann. 192, stated the rule in such cases to be:
* * * * * *
"Under our rule, the evidence [parol evidence] is said to be against the act, when it is introduced to prove the falsity of what is therein stated. It is said to be beyond the act, if the object of it be to add to the act a clause which it does not contain, or to enlarge those which it does contain. But when titles to land contain no specific description of the property conveyed, as in this case, the question of ownership can only be determined by the application of the title to the land, and by parol evidence. * * * (Italics in last sentence ours.) [i.e., the trial court]
`"In the case of New Orleans & Carrollton R. Co. v. Darms, 1887, 39 La.Ann. 766, 2 So. 230, 232, this court said:
`"We think * * * that the evidence fell within the familiar exception to the general rule which admits parol, in order to ascertain the nature and qualities of the subject-matter of the contract, e. g., to identify or define the extent of the premises leased or sold, when not sufficiently described in the written contracts * * *." [Emphasis supplied]
"In various memorandums and briefs submitted to the Court on the point defendant has cited in support of its argument the cases of Cupples v. Harris, 202 La. 336, 11 So.2d 609 (1942), Jackson v. Harris [18 La.App.], 136 So. 166 (La.App.2nd Cir. 1931) and Waterman v. Tidewater Associated Oil Company, 213 La. 588, 35 So.2d 225 (1947). The Court has concluded, however, that those cases do not support defendant's position because they were concerned with the rights of third parties as opposed to a controversy between the parties to the instrument in question, as is the case here.
"In the Waterman case, supra, the Court was presented with a petitory action brought by an individual claiming title under a deed transferring to him all the right, title and interest of the vendor in:
'All the land in the Parish of Plaquemines, in the State of Louisiana, being all the land in Township Twenty-one (21) South, Ranges Twenty-nine and Thirty (29 & 30) East, in the Southeastern Land District of Louisiana, West of the Mississippi River, comprising an area of 46,060 acres more or less. ...'
35 So.2d 229.
The defendants in Waterman were third-party possessors holding under an entirely different chain of title. The Supreme Court in rejecting plaintiffs' plea of ten years acquisitive prescription, found that the omnibus description under which plaintiff claimed was inadequate to form the basis of a title translative of property.
"It is clear, however, that the Waterman case and other similar authorities declaring an omnibus description to be effective as regards the rights of third-parties, has absolutely no bearing upon this case which involves a dispute between the parties to the document containing the allegedly incomplete description.
"This was made clear by the Louisiana Supreme Court in Williams v. Bowie Lumber Company, 214 La. 750, 38 So.2d 729 (decided after Waterman). The arguments *766 advanced by the defendant in Williams, and rejected by the Supreme Court, were remarkably similar to those made by Placid in the case at bar.
"The defendant in Williams resisted the claim of the plaintiffs on the ground that plaintiffs' ancestor in title had sold to defendant the lands in question under a deed containing the following omnibus description:
`The vendor herein declares that it is his true intent and purpose to sell to the purchaser herein all the property owned by him in the Parish of Lafourche....."
38 So.2d 730. [Emphasis supplied]
Plaintiffs contended that the above and foregoing omnibus description was meaningless and totally ineffective because it did not describe any particular property in sufficient detail. The Supreme Court, noting that the case involved a dispute between the parties to the contract, or their privies, rejected plaintiff's contention and held that the omnibus description conveyed to defendant all of the property owned by the named vendor and located in Lafourche Parish. The following language is in point:
`We think that the point (defendant's argument) is well taken for the reason that, as between the parties to the contract and their privies, a sale of real property by an omnibus designation is just as effective and binding as though the lands were specifically described.' 38 So.2d 730. [Emphasis supplied]
And further, commenting on authorities such as Cupples v. Harris relied on by Placid in the case at bar, the Court made the following observation:

`Counsel for plaintiffs nevertheless maintain that the clause relied upon by defendant is meaningless and invalid because of the lack of a detailed description of the lands and that, therefore, it conveys absolutely nothing. In support of this proposition, reliance is placed in Baldwin v. Arkansas-Louisiana Pipeline Co., 185 La. 1051, 171 So. 442; McCluskey v. Meraux & Nunez, La.App., 188 So. 669; Cupples v. Harris, 202 La. 336, 11 So.2d 609; Snelling v. Adair, 196 La. 624, 199 So. 782; Reynaud v. Bullock, 195 La. 86, 196 So. 29; United Gas Public Service Co. v. Mitchell, 188 La. 651, 177 So. 697 and Daigle v. Calcasieu Nat. Bank, 200 La. 1006, 9 So.2d 394, 395.

`The adjudications depended on do not support the contention of counsel and are not applicable to the situation presented here. All of those cases involved the rights of third persons and they are authority only for the proposition that a sale with an omnibus description does not supply notice to third persons who acquire an adverse interest in the lands. This was clearly pointed out in Daigle v. Calcasieu Nat. Bank, supra, where we remarked that, whereas Articles 3306 and 3307 of the Civil Code require precise description as one of the essentials for the validity of a conventional mortgage, there is no specific article of the Code with such a prerequisite as to sales. But, after referring to Articles 2251 and 2259, dealing with the registry of authentic acts by notaries in the Parish of Orleans and those in other parishes, and many authorities, the Court resolved that, to bind third persons, the act must contain a description of the immovables and concluded thus:

`"It seems to be settled now by the jurisprudence in Louisiana that such a vague and indefinite description, in an instrument purporting to convey title to real estate, as all of the land owned by the seller in a named parish, is not sufficiently specific to give notice to third parties thereafter dealing with the seller."

`We did not say that such a description rendered the sale invalid as between the immediate parties thereto. On the contrary, *767 we merely held that an omnibus description does not provide adequate notice to third parties.

`The difference between the line of cases depended on by plaintiffs and a matter such as this was perceived by the Circuit Court of Appeals for the Fifth Circuit in Saucier v. Crichton, 147 F.2d 430, where Judge Lee, as organ of the court, correctly announced that the former are limited in their application to third parties subsequently dealing with the vendor.' 214 La. 750, 755-756
"Application of the Williams reasoning to the case at bar is appropriate and disposes of defendant's argument against the admissibility of parol evidence. [Emphasis supplied]" (Written Reasons for Judgment, pp. 2-19, 20-27)
We find no manifest error committed by the trial judge in his resolution of these issues and specifications of error. Parol evidence was properly admissible under the circumstances of this particular case to particularize the significance of the term "Lapeyrouse Prospect," inasmuch as this involves a dispute between the immediate parties to the contract and does not adversely affect the rights of any third parties. The fact that the trial judge accepted the expert testimony offered by the Wurzlows rather than that offered by Placid in defining and delimiting "Lapeyrouse Prospect" is likewise not shown to constitute manifest error. The trial judge was also justified in adopting a construction or interpretation of the term "Lapeyrouse Prospect" so as to give effect to the contract rather than to render it nugatory.
The next specification of error is that the trial court erred in failing to hold that Placid's obligation under the August 16, 1949, letter agreement was extinguished by performance or by liberative prescription of ten years. Placid bases the first part of this argument on its contention that any obligation which it had to convey an overriding royalty to plaintiffs under the August 16, 1949, letter agreement was extinguished by payment under the provisions of Louisiana Civil Code Articles 2130 and 2131. This contention is based primarily upon the wording of the letter agreement which stated that Wurzlow was to be granted a one forty-eighth overriding royalty on all "new leases" taken by Placid at Lapeyrouse. Placid argues that the letter agreement applies only to leases which Wurzlow purchased for Placid in 1948 and 1949, which Placid contends is evidenced by the use of the word "taken" in the August 16, 1949, letter agreement. The record reveals, however, that Wurzlow purchased various leases for Placid at Lapeyrouse subsequent to 1949 and until 1959, and was given a one forty-eighth overriding royalty on these leases. The record contains no subsequent agreement entered into between the parties during this period of time, and it is readily apparent, accordingly, that Placid felt that the 1949 agreement was still binding and in effect because it paid the overriding royalty stipulated therein to Wurzlow on all leases acquired from 1949 to 1959. Placid's defense that the obligation was extinguished by payment in 1949 is without merit. Again, the use of words and terminology in the August 16, 1949, letter agreement, to the extent that they are ambiguous as to whether the one forty-eighth overriding royalty would apply to leases which Mr. Wurzlow had already acquired or whether it would cover subsequently acquired leases, must be construed against Placid as the author of the instrument.
The trial judge disposed of Placid's liberative prescription argument in the following manner:
"The next question for consideration is whether plaintiffs' right to compel defendant to recognize their rights under the 1949 Letter Agreement have been lost to any leases acquired by defendant on the Lapeyrouse Prospect more than ten (10) years from August 16, 1949. Based on Article 3544 of the Civil Code, *768 defendant argues that all of plaintiffs' rights under the August 16, 1949, Letter Agreement terminated on August 16, 1959, as to any mineral leases which had not come into existence at that time. The Court disagrees.
"First, it should be noted in passing that this same point has been once rejected by Judge Bourg of this Court in overruling the prior exception of prescription filed by Placid and the Court feels properly so. The same authorities now argued by defendant were submitted to and considered by Judge Bourg at the time his Judgment of May 26, 1969, was entered.
"The answer to defendant's contention is twofold. First, it is clear that Article 3544 deals with the liberative prescription relative to personal actions, as opposed to real actions such as that asserted in the case at bar, and that said articles are accordingly not applicable. Directly in point is Peterson v. Moresi, 191 La. 932, 186 So. 737 (1939) where Chief Justice O'Neill rejected a similar contention in the following words:
`The alternative plea of the appellants that, if the instrument sued on did originally represent a complete contract, and was an enforceable obligation, the right to enforce it became barred by the prescription of ten years under article 3544 of the Civil Code, is based upon the contention that this suit is only a personal actionnot a real action. The article provides that all personal actions, except those for which a period of prescription is theretofore especially provided in the code, are barred by the prescription of ten years. It is argued for the appellants that this suit is a personal action because the plaintiffs have so characterized it by asking in their petition for specific enforcement of the offer of A. P. Moresi to execute an instrument of transfer to the other persons named in the instrument sued on, or to their assigns, when requested so to do. But the plaintiffs, in their petition, did not pray merely for specific enforcement of A. P. Moresi's expression of willingness to give an act of conveyance to the other persons named in the instrument sued on, or to their assigns, whenever requested so to do. The plaintiffs prayed, primarily, for a judgment in their favor and against the defendants, "decreeing petitioners to be the owners of the undivided interests specified" in the instrument sued on, "in and to the land described" therein. The subsequent prayer for specific enforcement of the offer of A. P. Moresi to execute an act of transfer did not convert the real action into a personal action. In fact this additional prayer was unnecessary.

`A suit in which the plaintiff asks to be decreed the owner of real estate which is claimed by the defendant, and the title to which is on record in the name of the defendantthe suit being founded upon a written acknowledgment by the defendant that the property was bought by him as the agent for the plaintiff, and was paid for by the plaintiff and actually belongs to him is not a personal action, but a real action, and is not barred by the prescription of ten years under article 3544 of the Civil Code. Judson v. Connolly, 4 La.Ann. 169; Mussina v. Alling, 11 La.Ann. 568; Da Ponte v. Ogden, 161 La. 378, 108 So. 777.'
186 So. 739-740. [Emphasis supplied]
For a more recent case to the same effect see LaFleur v. Guillory (La.App. 3rd Cir.), 181 So.2d 323 [writ refused, 248 La. 1099, 184 So.2d 24]. Other authorities in point are Pearlstine v. Mattes, 223 La. 1032, 67 So.2d 582 (1953) and Louisiana Delta Farms Co. v. Davis, 202 La. 445, 12 So.2d 213 (1942).
"On the question of whether the action here asserted is a real or a personal action the Court reaffirms the holding *769 made in its judgment of April 3, 1967, overruling defendant's exception of venue, in which the Court found, based on Succession of Simms [250 La. 177], 195 So.2d 114 [1966], and La.R.S. 9:1105, that this action seeking to establish interests in oil, gas and mineral leases is based on the assertion of a real right.
"The second answer to defendant's prescriptive argument based on Article 3544 is the fact that this suit was filed on March 23, 1965, which is within ten (10) years from the dates defendant acquired all of the leases as to which plaintiffs claim an interest. This is significant because the Court believes that even if said ten (10) years prescription were applicable it would not begin to accrue until the date the particular lease was actually acquired by defendant. Obviously the obligation of defendant to transfer the override as to a particular lease could not mature until the lease was acquired and the suspensive condition inherent in the 1949 Letter Agreement is satisfied as to the particular lease. And, until the obligation to transfer matured, no prescription could run against the enforcement of same. This fundamental principle of Louisiana law is clearly expressed in cases such as Gueno v. Soumastre, 1 La.Ann. 44 (1846) and Succession of Clark, 155 So. 2d 37 (La.App. 4th Cir. 1963) and authorities cited therein.
"A final facet of defendant's argument on prescription is its attempt to bring the right of plaintiff within the prescription of Articles 3529 and 3546 of the Civil Code under which mineral servitudes and mineral royalty interests carved out of the fee title to land have been held to expire if not used within ten (10) years from the date created. See Frost-Johnson Lumber Co. v. Salling's Heirs, 150 La. 756, 91 So. 207 (1922) and Vincent v. Bullock, 192 La. 1, 187 So. 35 (1939). Use as to a mineral servitude sufficient to interrupt prescription occurs when good faith drilling is undertaken on the land subject to the servitude, whether successful or not, and use of a mineral royalty interest sufficient to interrupt prescription occurs when a well capable of producing oil or gas in commercial quantities is completed on the lands subject to the mineral royalty interest.
"The Court has concluded that defendant's attempt to compare the right asserted by plaintiffs herein to an `overriding royalty interest' to be carved out of a lessee's interest in an oil, gas and mineral lease, with a `mineral servitude' or `mineral royalty interest,' both of which are dismemberments of the fee title to land, is inappropriate. The use requirement inherent in the mineral servitude and mineral royalty interest doctrines are founded in a strong public policy against the continued dismemberment of the fee title to land and have nothing to do with an obligation to transfer an `overriding royalty interest' in oil, gas and mineral leases which are themselves simply rights upon the land as opposed to dismemberments of the fee title. In point are Wier v. Glassell, 216 La. 828, 44 So.2d 882 (1950) which defines an overriding royalty interest as a mere `appendage' of the lease and Reagan v. Murphy, 235 La. 529, 105 So.2d 210 (1958), in which the Supreme Court refused to apply the ten (10) year liberative prescription applicable to mineral servitudes and mineral royalty interests to oil, gas and mineral leases.
"Further, the Court is impressed with plaintiffs' argument that if the right to an overriding royalty interest set out in a contract is to be analogized to a mineral servitude or mineral royalty interest for purpose of applying the ten (10) year prescription for non-use, the question must be asked how would one use such a right to avoid the accrual of prescription?
"The answer would seem to be that each time Placid acquired a lease and recognized plaintiffs' rights thereon such *770 prescription would be interrupted by use of the right. And, since Placid transferred to defendant overriding royalty interests as to certain leases acquired on the Lapeyrouse Prospect as late as 1959 (Tr. 225) use of the right in the manner contemplated in the initial grant clearly occurred until that time. Thereafter, in 1963, well within ten (10) years from the date of such use plaintiffs requested that the additional override be transferred, thus again using their rights under the letter agreement. Defendant refused plaintiffs' 1963 request and this suit then was filed in 1965 to assert plaintiffs' rights which again would appear to constitute use of plaintiffs' rights within ten (10) years of the last actual recognition of plaintiffs' rights by defendant in 1959." (Written Reasons for Judgment, pp. 27-31)
The result reached by the trial judge relative to Placid's liberative prescription argument is not manifestly erroneous, since assuming arguendo that the right sought to be enforced herein by plaintiffs is personal and not real, nonetheless, the liberative prescription could not commence to run until the various leases were acquired and the applicable prescriptive period was interrupted, as to each lease, either by payment by Placid or by timely institution of suit.
Placid's next specification of error is that in the alternative the trial court erred in holding that Kermit Wurzlow did not compete directly with Placid in purchasing leases and that by such competition, directly with Placid in purchasing leases and that by such competition, Kermit Wurzlow did not breach his contract with Placid and lost all further rights thereunder. The trial judge disposed of this issue in the following manner:
"Another minor defense raised by defendant in its letter of November 29, 1963, by which it first refused to transfer to plaintiffs additional overriding royalties on the leases acquired in the western portion of the Lapeyrouse Field was the alleged competition of Kermit Wurzlow with Placid in the acquisition of leases described in said letter as situated in the area colored blue on the plat included with said letter which was attached to plaintiffs' petition as Exhibit D and introduced into evidence as Wurzlow Exhibit 19. At the trial Mr. Wurzlow testified that he purchased only three (3) small leases in the area and then only after he had been advised that Placid did not intent to use his services any longer at Lapeyrouse. This statement was not contradicted by Placid and Mr. Wurzlow was in fact not used by Placid at Lapeyrouse from 1959 forward. Additionally, Placid introduced absolutely no evidence as to any alleged competition as to other leases covering the blue area described on Wurzlow Exhibit 19 and none can be assumed by the Court. Viewing the evidence as a whole the Court concludes that Placid has failed to support its claim of alleged competition by competent evidence, particularly in view of the fact that at the time the three (3) small leases in question were taken, Placid no longer asked or expected Mr. Wurzlow to perform any services for its account." (Written Reasons for Judgment, pp. 35-36)
We find no manifest error committed by the trial judge in his resolution of these issues of fact and find no error in this application of the law thereto. The record shows that Mr. Wurzlow acquired these three leases only after he was advised that Placid no longer desired his services. By virtue of this unilateral termination on the part of Placid of Mr. Wurzlow's services, Mr. Wurzlow lost the cash commission which he would receive on each lease personally acquired by him in addition to the appropriate overriding royalty. The trial court committed no manifest error in classifying this alleged competition as insignificant and insufficient to operate as a forfeiture of plaintiffs' rights under the August 16, 1949, letter agreement.
*771 Placid's next specification of error is that, alternatively, the trial court erred in holding that the right to an accounting for royalty was subject to the ten-year liberative prescription rather than the three-year liberative prescription. This specification of error is without merit and was properly disposed of by the trial judge. In this connection we reproduce with approval the following excerpt from the trial judge's Written Reasons for Judgment:
"Defendant's final argument based on liberative prescription relates to plaintiffs' claim for an accounting for all production attributable to the overriding royalties in question from the date of first production through the present date. Defendant apparently concedes, as it must, that plaintiffs are due an accounting for such production if plaintiffs' main claim to the 1/48th overriding royalties is sustained. See Articles 862 and 3652 of the Louisiana Code of Civil Procedure and Davies v. Texarkana Crude Oil Co., 154 La. 424, 97 So. 597 (1923), Harris v. J. C. Trahan Drilling Contractor, Inc., 168 So.2d 881 (La.App. 2nd Cir. 1964), Midstates Oil Corp. v. Waller, 207 F.2d 127 (5th Cir. 1953) and Williams v. Humble Oil & Refining Co., 432 F.2d 165 (5th Cir. 1970).
"Defendant does contend, however, that the right to an accounting should be limited to the three (3) year period immediately prior to the filing of plaintiffs' supplemental petition on November 6, 1970. The Court finds that plaintiffs' claim to an accounting should not be so limited.
"First, under Article 1153 of the Louisiana Code of Civil Procedure, the amended petition, asking for an accounting, asserts a claim ancillary to the main cause of action and thus relates back to the date of the filing of the original pleading, March 23, 1965. See State v. Sciortino, 245 La. 587, 159 So.2d 685 (1964) and Williams v. Humble Oil & Refining Co., 432 F.2d 165, 170 (5th Cir. 1970). Thus, any applicable prescriptive period would have to be measured from that date and not the date of the filing of the amended petition.
"With respect to the question of what is the appropriate prescriptive period applicable to the claim for an accounting, if any, the Court has concluded it would be the ten (10) year prescription set out in Article 3544 of the Civil Code and not the three (3) year prescriptive period provided in Article 3538 which applies to rents due under a lease. The cases cited by defendant applying the three (3) year prescription of Article 3538 to claims for royalties due under an existing mineral lease are not applicable to the case at bar. In each of those cases the question related to the prescription applicable to a lessor's or landowner's royalty' admittedly due under a mineral lease, such as the traditional 1/8th or 1/6th royalty normally reserved by a landowner in executing a lease, and had nothing to do with a situation like that involved in the case at bar where an `overriding royalty interest' is to be created by the lessee out of his working interest portion of a previously acquired lease. In the latter case there is obviously no relationship of lessor and lessee as between the owner of the mineral lease and the potential owner of the overriding royalty interest which the Court believes to be an essential prerequisite to the application of Article 3538 pertaining to arrearages in rent.
"More appropriate the Court believes are those authorities dealing with the prescription applicable to a claim for monies had and received which all hold that the applicable prescriptive period is the ten (10) year prescription set out in Article 3544 of the Civil Code. See Rudnick v. Union Producing Co., 209 La. 943, 25 So.2d 906 (1946) and Da Ponte v. Ogden, 161 La. 368 [378] 108 So. 777 *772 (1926). The following language from the Da Ponte case is in point:
`The action is a mixed action. It partakes in its nature the character of both a real and a personal action.
`It is a real action in so far as it seeks to recover an undivided interest in the lands and to compel defendants to execute title. It is personal in so far as it calls on defendants to account for and pay over one-sixth of the royalties received from said land.
`Article 3548, Civil Code, provides that all actions for immovable property are prescribed by 30 years. The case clearly falls within the terms of this article of the Code. The purpose of the action is to recover an interest in an immovable, based on an agreement to sell, and to compel defendants to comply with that agreement by the execution of a deed. It is apparent, therefore, that that part of the demand is a real, and in no sense a personal, action.
`The demand for the return of money had and received is in the strict sense a personal action, subject to the prescription of 10 years. The demand, however, is well without the prescriptive period, since an accounting and payment is only claimed from November 9, 1915, and this suit was filed February 14, 1921.'
108 So. 781 [Emphasis supplied]
"Inasmuch as first production from the leases in question did not commence more than ten (10) years prior to the date on which plaintiffs' initial petition was filed, March 23, 1965, plaintiffs' right to an accounting is not affected by prescription and they are entitled to a full accounting for all prior production attributable to said overriding royalties with interest thereon, computed from the dates on which said production was recovered and the proceeds attributable thereto were received by defendant. Midstates Oil Corp. v. Waller, 207 F.2d 127 (5th Cir. 1953) and the authorities cited therein. * * *" (Written Reasons for Judgment, pp. 31-34)
While the trial judge properly concluded that the "royalty" reserved by the lessor and owed by the lessee is analogous to rent, such is not necessarily the case with regard to an "overriding royalty" such as is involved in the instant litigation. In the instant case there exists no lessorlessee relationship so as to warrant applicability of a classification of the one forty-eighth overriding royalty owed by Placid to the Wurzlows as "rent" or "rent charge." Prescription statutes are stricti juris and the defendant bears the burden of proving the applicability of a particular prescriptive statute relied on. We conclude the trial judge committed no manifest error in holding that defendant failed to prove the applicability of the three-year prescriptive provision of Louisiana Civil Code Article 3538.
Placid's next specification of error is that since plaintiffs' claim was an allegedly unliquidated claim, the trial court erred in holding that legal interest began to run from the date the defendant received the funds rather than from the date of judgment.
Admittedly, the jurisprudence with regard to the time when interest commences to run is confusing and inconsistent. Another panel of this Court held in Pittman and Matheny v. Davidge, 189 So.2d 706 (La.App. 1st Cir. 1966), writs refused, 249 La. 768, 191 So.2d 143; 249 La. 771, 191 So.2d 144, that interest is not allowable on an unliquidated claim from date of judicial demand and instead is allowable only from date of judgment. In this decision another panel of this Court set out some of the divergent pronouncements relative to the time when interest commences to run, but based its decision primarily on the Louisiana Supreme Court case of Sugar Field Oil Company v. Carter, 214 La. 586, 38 *773 So.2d 249 (1948), as well as the Louisiana Supreme Court decisions of Burk v. Livingston Parish School Board, 191 La. 364, 185 So. 284 (1938), and Connette v. Wright, 154 La. 1081, 98 So. 674 (1923).
We note, however, that in Pease v. Gatti, 205 La. 949, 18 So.2d 511 (1944), the Louisiana Supreme Court held that in an action to compel the defendant to account for a mortgage note, the plaintiff was entitled to interest from the date defendant received the note as against the contention that the interest should be allowed either from the date of judicial demand or from the date of judgment rendered on the accounting. In reaching this conclusion the Louisiana Supreme Court cited from and quoted with approval the case of Friede v. Myles Salt Company, Ltd., 177 So. 105, 108 (La.App.Orl.Cir.1937), as follows:
"In the case of Friede v. Myles Salt Company, Limited, 177 So. 105, 108, the Court of Appeal of the Orleans Circuit considered a question very similar to the one here presented, and it appropriately and correctly observed that:
`We note that prior to 1839, interest was not allowed on accounts or unliquidated claims. Until that time, article 554 of the Code of Practice of 1825 provided that: "No interest shall be allowed on accounts or unliquidated claims." We deem it significant that by Act No. 53 of 1839 that provision was repealed. Now, apparently as a result of Act No. 181 of 1852, the article reads as follows: "Interest at the rate of five per cent shall be allowed on all debts from the time they become due, unless otherwise stipulated."
`The Civil Code provision on the subject has sustained a similarly significant alteration. Article 1932 of the Code of 1825 provided that: "In contracts, which do not stipulate for the payment of interest, it is due from the time the debtor is put in default for the payment of the principal, and is to be calculated on whatsoever sum shall be found by the judgment to have been due at the time of the default."
`However, that article (1932) of the former Code has now become article 1938 of our present Civil Code, which reads as follows: "All debts shall bear interest at the rate of five per centum per annum from the time they become due, unless otherwise stipulated."
`It is obvious that both changes indicate an intention that interest shall be allowed on unliquidated, as well as on liquidated, claims, and that interest shall commence to run at the time the debt becomes due, regardless of putting in default.
`Act No. 206 of 1916, providing "that legal interest shall, hereafter, attach from date of judicial demand, on all judgments, sounding in damages, `ex delicto'" has no application, for, by its own terms, it controls only "* * * judgments, sounding in damages `ex delicto'."'
"Under this interpretation of the mentioned provisions of our present Civil Code and Code of Practice (Articles 1938 and 554 respectively), it must be held that legal interest on plaintiffs' claim commenced to run on July 25, 1931, the date when defendant received the $3,000 promissory note that rightfully belonged to Pease. This conclusion is further supported by Lotz v. Hurwitz et al., 174 La. 638, 141 So. 83, in which we held that the sum defendants were required to pay to make a wall on plaintiff's property a party wall should bear interest from date defendants took possession of it, this being the time when the indebtedness became due and demandable.
"The authorities cited and relied on by defense counsel are inappropriate. Bertrand *774 v. Frazier, 11 La. 236, was decided in June, 1837, before the adoption of our present codal provisions. Crichton et al. v. Standard Oil Company of Louisiana, 178 La. 57, 150 So. 668, in which it was incorrectly said that interest on unliquidated claims could not be allowed except from judicial demand, was erroneously predicated on State v. Bank of Louisiana, 6 La. 745, decided in June, 1834 long prior to the effective date of the aforementioned statutory change." (Pease v. Gatti, 18 So.2d 511, 513Emphasis supplied)
This decision obviously stands for the proposition that interest is recoverable on both liquidated and unliquidated claims and commences to run at the time the debt becomes due, regardless of the nature of the debt. The Pease case was relied on by the Second Circuit Court of Appeal in Culpepper v. Slater, 131 So.2d 76, 81 (La.App. 2nd Cir. 1961). Admittedly, Sugar Field Oil Company v. Carter, cited supra, is subsequent in date to Pease v. Gatti, but it is noted that no mention of the law as interpreted in the Pease case is contained in the Sugar Field Oil Company opinion.
We also note that in Da Ponte v. Ogden, 161 La. 378, 108 So. 777 (1926), a case which antedates both the Pease case and the Sugar Field Oil Company case, the Louisiana Supreme Court held that a plaintiff who was awarded a judgment compelling an accounting was likewise entitled to interest on the amounts due him for royalties of land from respective dates at which the amounts were received by the defendants, rather than from date of judicial demand or from date of judgment:
"The plaintiff has answered the appeal, and prays for legal interest on the amounts due by the defendants from the respective dates at which such amounts were received by defendants and for which they are held to account. The judgment should be amended in this respect.
"It is therefore ordered that the judgment be amended by allowing plaintiff legal interest on the amounts received to date from the time each amount was received, and, as thus amended, said judgment is affirmed, at the cost of defendants." (Da Ponte v. Ogden, 108 So. 777, 781, 782)
Considering the jurisprudence and in particular the more thorough exposition of the legal principles contained in Pease v. Gatti, cited supra, we believe that the trial judge properly awarded interest on all sums received by defendant for which an accounting was due to plaintiffs from the date of receipt.
We do not believe, however, that the judgment should have increased the interest from five percent per annum to seven percent per annum by virtue of Act 315 of 1970, amending Louisiana Civil Code Article 1938. It has been repeatedly held that this amendment is not retroactive with the result that where a debt became due prior to July 29, 1970, the five percent per annum legal interest rate, rather than the seven percent per annum legal interest rate, applies, Inabinet v. State Farm Automobile Insurance Company, 262 So.2d 920, 923 (La.App. 1st Cir. 1972), and cases cited therein; Kilgore v. Allstate Insurance Company, 245 So.2d 537 (La.App. 3rd Cir. 1971). Although the amended and supplemental petition was filed by plaintiffs on November 6, 1970, and therefore after the effective date of this legislative amendment to the applicable rate of legal interest, nevertheless, it has previously been indicated herein that the trial judge properly permitted this amendment to relate back to the date of filing of the original suit, or March 23, 1965, with the result that the five percent per annum legal interest rate must apply herein. To the extent that the *775 judgment of the trial court differs, it is amended.
Placid's final specification of error is that the trial court erred in recognizing that the plaintiffs were owners of a one forty-eighth overriding royalty on alleged renewals of British-American leases. We find merit to this specification of error. The burden of proving the particular leases as to which plaintiffs are entitled to the one forty-eighth overriding royalty in this declaratory judgment action obviously rested with the plaintiffs. The record contains unrefuted evidence showing that the leases identified as Wurzlow's Exhibits V-9, V-28, V-40 through -46, V-59, V-67, V-68, V-79, V-84 through -88, V-90 through -92, V-99, V-104 and V-121 were renewals of British-American leases and as such not subject to the one forty-eighth overriding royalty granted under the August 16, 1949, letter agreement. The judgment appealed from, accordingly, is amended to delete therefrom the aforementioned leases.
For the foregoing reasons, the judgment is amended so that the one forty-eighth overriding royalty interest decreed to plaintiffs be recognized not to cover the leases identified as Wurzlow's Exhibits V-9, V-28, V-40 through -46, V-59, V-67, V-68, V-79, V-84 through -88, V-90 through -92, V-99, V-104 and V-121. The judgment of the trial court, as amended by the trial court, is further amended so as to require that defendant pay interest on all monies shown to be owed to plaintiffs in the accounting ordered by the court at the rate of five percent per annum on all sums received by defendant from date of receipt until paid. In all other respects the judgment appealed from is affirmed, with defendant to pay three-fourths of all costs of this appeal and with plaintiffs to pay the remaining one-fourth of the costs of this appeal.
Amended and as amended affirmed.
NOTES
[1] Consistent with the trial judge's pronouncements herein is this Court's decision in Pecot v. Callery Properties, Inc., 247 So.2d 160 (La.App. 1st Cir. 1971), wherein this Court held that any ambiguities in a mineral lease and a letter agreement would be resolved in a light most favorable to the mineral lessors where the mineral lease and letter agreement which provided for overriding royalties had been prepared by the mineral lessee.