313 So.2d 612 (1975)
STAPLE COTTON COOPERATIVE ASSN., Plaintiff-Appellee,
v.
J. A. PICKETT, Sr., Defendant-Appellant.
No. 4888.
Court of Appeal of Louisiana, Third Circuit.
April 21, 1975.
Rehearing Denied June 18, 1975.
Writ Granted September 25, 1975.
*613 Felix A. DeJean, III, and Patrick C. Morrow, Opelousas, for defendant-appellant.
Voelker, Ragland & Brackin by Frank Voelker, Jr., Lake Providence, for plaintiff-appellee.
Before FRUGÉ, HOOD, MILLER, DOMENGEAUX, and WATSON, JJ.
WATSON, Judge.
This is an appeal from a judgment ordering delivery of cotton as specific performance of a set of contracts entered into by Staple Cotton Cooperative Association, plaintiff and defendant-in-reconvention, and J. A. Pickett, Sr., defendant and plaintiff-in-reconvention. Staple Cotton is a cooperative which usually acts as agent in selling cotton on behalf of its members at an advantageous price, but which here claims it was the purchaser of defendant's 1973 crop; and Pickett is a farmer who contends that his contracts with Staple Cotton are void or, in the alternative, that his liability is limited to liquidated damages of 5¢ per pound.
We find the decisive issues to be whether the contract between the parties was ambiguous, and if so, what are the resulting rights of the parties?
The facts are not overly complicated. Pickett has twelve relatively small farms in St. Landry Parish on which at least part of his crop consists of cotton. Staple Cotton Cooperative Association is a cooperative based in Greenwood, Mississippi which is principally engaged in the business of acting as agent for its farmer-members in selling their cotton to cotton buyers, both in this country and abroad. According to the witnesses for Staple Cotton, they are able to obtain a better price for their members by joint selling in some form or other than could the individual farmers selling cotton on their own behalf.
In 1972 Pickett was a member of Staple Cotton, and he entered a marketing agreement with Staple Cotton. He had agreed to a "forward sales contract"[1] with a buyer obtained by Staple Cotton, the buyer being W. B. Dunavant & Company, who is not a party to this proceeding. In the 1972 transaction, Staple Cotton acted as agent on behalf of Pickett. The 1972 forms are very similar to the 1973 forms, but Dunavant was clearly indicated as buyer; Pickett as seller; and Staple Cotton as agent.
In 1973, in the month of March, Staple Cotton sent two sets of documents to Pickett. These were forms prepared and printed by Staple Cotton. Because Pickett had 12 farms, these documents were executed in several copies, there being 12 of the membership and marketing agreements and two of the sale and purchase agreements. Although the two sets of instruments bore different dates, the record reflects *614 that they were executed at the same time, as part of one transaction.[2]
Since the documents were executed between the same parties, (Pickett and Staple Cotton) on the same date, and concerned the same object (Pickett's 1973 cotton crop) we hold that they are one contract and must be construed together.
We will not reproduce the instruments in their entirety, but we will summarize them, referring to them in the singular even though there were two of the sale and purchase agreements and 12 of the other instruments. In the preamble the sale and purchase agreement states that it is entered into by Pickett "as producer and seller" and Staple Cotton Cooperative Association "as buyer". The instrument states that seller agrees to sell to buyer his cotton produced in 1973 from the certain identified farms. Various other terms of the sale are included as well as certain prices, the high being 30¢ per pound, depending on grade and delivery date. In paragraph 3, Staple Cotton Cooperative Association is referred to as "agent". Two other paragraphs make reference to Staple Cotton's capacity. These are as follows:
"6. Seller and Buyer expressly agree that all cotton covered by this contract shall be marketed through Staple Cotton Cooperative Association of Greenwood, Mississippi, under its usual marketing agreement where applicable, with all records to be maintained by them for both Producer and Seller's and Buyer's accounts in the usual manner.
"8. We, the Producer and Seller and the Buyer, with Staple Cotton Cooperative Association acting as agent only, have carefully read and fully understand the terms and provisions of the foregoing contract, which represents the entire agreement between the parties, and understand further that there may be no modification of this agreement except in writing." (Emphasis added)
Significantly, paragraph 6 points out that the cotton shall be marketed through Staple Cotton "under its usual marketing agreement" which we will examine below and in paragraph 8 Staple Cotton is stated to be "acting as agent only" which contradicts the preamble.
The other document is the "application for membership and marketing agreement" which reflects that Pickett applied for membership in the Staple Cotton Cooperative Association, and after reciting the advantages of membership in Staple Cotton, the instrument undertakes to describe the rights and duties of the member. (Staple Cotton is sometimes referred to in the documents as the "Association").
*615 In paragraph 2(a) the Association agrees to buy and the Grower agrees to sell to Staple Cotton, all of his cotton produced during the current year and all subsequent years. However, paragraph 5(a) makes clear that the Association is buying the cotton as agent to sell on behalf of the member with the member to receive the net price. Paragraph 5(a) will be quoted in pertinent part:
"The Association agrees to sell such cotton at the best price obtainable by it under prevailing market conditions by one of the methods hereinafter set forth in paragraphs 6(a) and 6(b) to be selected by the grower, and to pay the grower as settlement in full therefor the net amount received therefrom, less freight, insurance, storage and interest, . . ."
The methods of sale referred to are the "pool option" and the "factor option" which are methods through which the grower's cotton is sold to his advantage.
When these terms of the membership and marketing agreement are considered along with the terms of the sale and purchase agreement where Staple Cotton is identified in both variously as agent and buyer, the contract becomes ambiguous.
The legal relationship between Pickett and Staple Cotton cannot be, as the contract confected by Staple Cotton purported to establish, both vendor-vendee and principal-agent as to Pickett's 1973 crop. The utmost good faith is exacted in all dealings of an agent touching the interest of his principal. Forshay v. Lewis, La.App., 81 So.2d 114. We do not suggest that Staple Cotton was lacking good faith; merely that the "utmost good faith" is not a quality consistent with the vendor-vendee relationship which Staple Cotton now urges. Staple Cotton could not wear two hats (agent's and buyer's) at the same time or switch them at will.
In other words, Staple Cotton is not clearly identified as an independent buyer of the cotton in these instruments, as now contended in this legal proceeding. The burden of establishing the validity or enforceability of a contract of sale rests upon the party who seeks to establish it. Hebert v. Briley, 295 So.2d 607 (La.App. 3 Cir. 1974), writ refused, La., 300 So.2d 181. Staple Cotton has failed to carry the burden.
The forms were prepared and printed by Staple Cotton and they were sent to Pickett for his signature. The law is settled that a contract containing ambiguities must be construed against the writer of the contract. Monsur v. Thompson, 300 So.2d 655 (La.App. 3 Cir. 1974). Wurzlow v. Placid Oil Company, 279 So.2d 749 (La.App. 1 Cir. 1973); writ refused, La., 282 So.2d 140.
This rule applies to printed form contracts:
"Where there is ambiguity in a printed contract and a court is called upon to interpret their meaning and import, such ambiguity or contradiction is construed against the party who prepared the contract or printed form." Centanni v. A. K. Roy, Inc., 258 So.2d 219 at 222. (La.App. 4 Cir. 1972)
We conclude that Staple Cotton is not entitled to specific performance.
We proceed to consider the resulting rights of the parties.
The membership and marketing agreement sets forth in paragraph 15 the results of the failure on the part of the grower to sell his cotton through Staple Cotton. We will quote sub-paragraph (a):
"Inasmuch as the remedy at law would be inadequate; and inasmuch as it is now and ever will be impracticable and extremely difficult to determine the actual damage resulting to the Association, should the Grower fail so to sell and deliver all of his cotton, the Grower hereby agrees to pay to the Association for all *616 cotton delivered, sold, consigned or marketed by or for him other than in accordance with the terms hereof, the sum of five cents per pound as liquidated damages for the breach of this contract; all parties agreeing that this contract is one of a series dependent for its true value upon the adherence of each and all the growers to each and all of the said contracts."
Also, in sub-paragraph (b) the agreement states that the Association shall be entitled to an injunction to prevent breach of the agreement and to a decree of specific performance. Sub-paragraph (c) provides that the grower would be liable for all court costs and for all expenses of travel and other expenses as well as attorney's fees incurred by Staple Cotton.
Of course, the specific performance as contemplated by sub-paragraph 15(b) is the performance described in the membership and marketing agreements as construed in conjunction with the purchase and sales agreement. This specific performance would be the selling of his cotton by Pickett through Staple Cotton (as agent) to some third party at the best price obtainable with the net proceeds going to Pickett. This is not the specific performance asked by Staple Cotton as plaintiff in this lawsuit.
The capacity of Staple Cotton as agent is pointed out by the testimony of some of the witnesses. H. L. Hodges, assistant general manager and treasurer of Staple Cotton, testified that:
". . . we act generally as the member's agent in the sale of his cotton." (TR. 80)
But the contention of Staple Cotton in the present litigation is as the witness Hodges testified:
"Q. But in this case it bought the cotton itself?
A. It bought the cotton itself, Staple Cotton is the principal.
Q. So it didn't act as agent?
A. That's right.
Q. Regardless of what the contract says?
A. Correct." (TR. 82)
The difficulty of this interpretation by Staple Cotton is emphasized by the testimony of house counsel for Staple Cotton, Mr. Robert E. Dilatush, Jr. when he stated that:
"Actually when we are the buyer parts of this thing I presume would be inapplicable as to certain interpretations." (TR. 110)
However, the writer of a contract is not entitled to consider inapplicable certain portions of the contract as he deems expedient.
Therefore, we conclude that Staple Cotton has no right to require specific performance of the contract by requiring the delivery of the cotton from Pickett to Staple Cotton. There is no showing that Staple Cotton has sold the cotton as agent on behalf of Pickett to anyone at the most advantageous price obtainable for Pickett. On the other hand, the testimony in the record is clear that Pickett realized that by failing to sell the cotton through Staple Cotton he would incur a penalty of 5¢ per pound. As he testified:
"Q. But nobody ever told you that you could avoid the contract for five cents a pound?
A. Well, they didn't have to tell me, all I could do was read. I went to school a little bit and I learned how to read and I read what was on the contract and I understood what was on the contract.
Q. So it is your testimony that the only thing that you are going by is
A. Is what I read.
Q. what you read.

*617 A. That's all I can go by. In fact, part of the contract says that's all we could go by is what's written on the contract." (TR. 121)
Although Pickett by his reconventional demand asks that the entire transaction be declared void because of the ambiguities in the contract, we find that he clearly understood his penalty obligation if he failed to deliver his cotton to Staple Cotton. As plaintiff-in-reconvention Pickett seeks a declaratory judgment to establish the rights of the parties. LSA-C.C.P. art. 1871 et seq. We have concluded that his obligation should be recognized to pay liquidated damages of 5¢ per pound as provided in the membership and marketing agreement. We find no merit to Staple Cotton's claim that it is entitled to damages beyond the 5¢ per pound.
It is therefore ordered, adjudged and decreed that there be judgment dismissing the demands of Staple Cotton Cooperative Association for specific performance and for damages, but that a declaratory judgment be and it is hereby entered interpreting the sales and purchase agreements and the membership and marketing agreement entered into between Staple Cotton Cooperative Association and J. A. Pickett, Sr. to require the payment by J. A. Pickett, Sr. to Staple Cotton Cooperative Association of the sum of 5¢ per pound as liquidated damages for all cotton grown during the crop year 1973 in St. Landry Parish on the farms cultivated by J. A. Pickett, Sr. and identified as ASC Farm Serial Nos.
G-228 G-7501 G-193 G-132 G-58 G-61 G-0515 G-140 G-0520 G-272 G-271 G-1504
Costs of these proceedings, both in the trial court and on appeal, will be ordered paid half by J. A. Pickett, Sr. and half by Staple Cotton Cooperative Association.
Reversed and rendered.
HOOD, J., dissents and assigns written reasons.
FRUGÉ, J., respectfully dissents for same reasons assigned by Judge HOOD in his written reasons as a dissent.
HOOD, Judge (dissenting).
I disagree with my colleagues in several of their findings and in the ultimate conclusions which they have reached in this case.
Plaintiff and defendant entered into two "Sale and Purchase Agreements," both dated March 6, 1973, under the terms of which Pickett agreed to sell, and Staple Cotton agreed to buy, all of the cotton produced by Pickett during the 1973 crop season on twelve different farms in St. Landry Parish. One of those agreements related to the cotton produced in 1973 from three separate farms, identified by their ASCS Farm Serial Numbers, comprising a total of 64 acres. The other related to the cotton produced that year from nine other serially numbered farms, comprising a total of 461 acres. Each agreement stipulated that the following prices would be paid for the cotton:
"30.00¢ per lb for all cotton with whse receipt date of Dec 7, 1973 or earlier except B/G's
"26.00¢ per lb for all cotton with receipt dated After Dec 7, 1973 except B/G's
"21.00¢ per lb for all B/G's"
Both parties also executed twelve separate documents, all dated March 14, 1973, each of which is identified as an "Application for Membership and Marketing *618 Agreement." One of those agreements was executed for each of defendant's twelve serially numbered farms described in the above Sale and Purchase Agreements. The execution of those documents by both parties had the effect of making Pickett a member (as a Grower) of Staple Cotton Cooperative Association. As a member, he shares in earnings of the association, and he is entitled to all of the services rendered by it.
Staple Cotton is a cooperative association made up of cotton growers, and its purpose is primarily to assist members in marketing their cotton. One of the services the association renders is to find buyers for the cotton raised by its members, and under the agreement the Member-Grower binds himself to sell and deliver all of the cotton he raises to the buyers located by Staple Cotton. The association receives a commission for selling the cotton. If the Grower fails or refuses to sell or deliver his cotton to the buyer found by the association, then Staple Cotton is entitled to recover from the defaulting grower liquidated damages of five cents per pound for that breach of contract. The Marketing Agreement, of course, does not purport to regulate the rights which the Buyer may have against the seller, that is, the Member-Grower, if such a sale is made and the Member-Grower refuses to deliver the cotton which was sold.
The majority correctly points out that all of those agreements were mailed to Pickett at one time in a single envelope, and he signed all of them on March 14, 1973.
Defendant produced cotton from all twelve of the above mentioned farms during the 1973 crop season. The cotton so produced by him, consisting of about 321 bales, is stored, and defendant has the warehouse receipts in his possession. None of that cotton has been sold.
The majority has pointed out that the Sale and Purchase Agreements entered into by the parties are known as "Forward Sale Contracts," and that it is a common practice in that business to use Forward Sale Contracts in selling an entire crop before the cotton is produced. Each Sale and Purchase Agreement, on its face, is binding on the seller and on the buyer. Pickett was well aware of that method of selling cotton crops, and he personally agreed to the Forward Sale Contracts which are at issue here.
The price which plaintiff agreed to pay defendant for his 1973 cotton crop was the market price for cotton to be produced that year at the time the parties entered into those Purchase Agreements. It was the "best price obtainable by it under prevailing market conditions" at the time of the sale. The sale was completed by means of the "factor option" provided in the Marketing Agreement and specifically agreed to by Pickett. By the time the cotton was harvested and ready for delivery in the fall of 1973, however, the price had gone up to at least $.60 per pound.
There is no showing that plaintiff, Staple Cotton, knew or had reason to suspect when the Purchase Agreements were signed that the market price of cotton would increase during that year. After the 1973 cotton crop was harvested, plaintiff demanded that defendant deliver to it the cotton which he had produced, for the price set out in the Sale and Purchase Agreements, that is, the Forward Sale Contracts which the parties had completed several months earlier. Defendant refused, and this suit was filed to compel specific performance of those Forward Sale Contracts.
Defendant contends primarily that "plaintiff was acting as his agent in a fiduciary relationship and obtained an undue advantage by buying the cotton at $.30 per pound and attempting to sell it at a substantial profit." He argues that plaintiff owed him the duty of getting the "best prices obtainable" for his crop, that it breached its fiduciary relationship toward defendant, and that the trial court erred in *619 permitting plaintiff to enforce the contracts.
The trial judge held that the Sale and Purchase Agreement was not ambiguous, that Pickett obligated himself to deliver his cotton pursuant to that agreement, that there was no relationship between the Forward Sale Contracts and the Marketing Agreements, and that Staple Cotton was entitled to specific performance of his contract. He obviously concluded also that Staple Cotton acted in good faith, that it did not obtain an undue advantage over defendant, that it bought the cotton from Pickett at the best price obtainable for it under the prevailing market conditions, and that it did not breach any fiduciary relationship which may have existed between the parties. He thus rendered judgment ordering specific performance of the contract.
The majority of this court, in reversing the trial judge, has held (1) that the Sale and Purchase Agreements and the Marketing Agreements entered into between Staple Cotton and Pickett constitute "one contract" and must be construed together; (2) that "Staple Cotton is not clearly identified as an independent buyer of the cotton in these instruments;" (3) that the Sale and Purchase Agreement, when considered with the Marketing Agreement, is ambiguous; and (4) that because of that ambiguity Staple Cotton is not entitled to specific performance, but that it is entitled to recover stipulated damages from defendant because "Pickett realized that by failing to sell the cotton through Staple Cotton he would incur a penalty of $.05 per pound." My colleagues intimate that Staple Cotton purchased defendant's cotton crop at a price which was not "the most advantageous price obtainable for Pickett." They state that they "do not suggest that Staple Cotton was lacking good faith," but they apparently hold that it did not show the "utmost good faith" in purchasing defendant's 1973 cotton crop, and that there was a violation of the fiduciary relationship existing between Staple Cotton and Pickett under the Marketing Agreement.
The trial judge arrived at factual conclusions which are opposite on every issue to those found by my colleagues. I agree with the findings of the trial judge who observed the witnesses as they testified. I cannot agree with any of the above conclusions reached by my colleagues.
The established jurisprudence of this state is that the factual findings of the trial judge are entitled to great weight, and that his conclusions as to the facts will not be disturbed unless found to be clearly erroneous. Fontenot v. LaFleur, 281 So.2d 868 (La.App. 3 Cir. 1973); Coward v. United States Fidelity & Guaranty Co., 289 So.2d 506 (La.App. 3 Cir. 1974).
Two other opinions are being handed down by this court today, in both of which we make much stronger statements than the one I have just made as to the weight which should be attached to the findings of the trial court. See Monk v. Veillon, et al., La.App., 312 So.2d 377 and Penrod Drilling Company v. Langlinais, et al., La.App., 312 So.2d 368. Yet, the majority in the instant suit does not give even lip service to that established principle of law. Instead, they brush aside and completely ignore all of the findings of the trial court as they arrive as a different version of the facts.
Another established principle of law applicable here is that when there is anything doubtful in agreements, the court must endeavor to ascertain what was the common intention of the parties, rather than adhere to the literal sense of the terms. LSA-C.C. art. 1950; Monsur v. Chaddick, 274 So. 2d 499 (La.App. 3 Cir. 1973); Howk v. Sulphur Motor Company, 155 So.2d 272 (La.App. 3 Cir. 1963). All clauses of agreements are interpreted the one by the other, giving to each the sense that results from the entire act. LSA-C.C. art. 1955.
My colleagues apparently overlooked the above rules. Although they concede that *620 the Sale and Purchase Agreement shows throughout the contract that Staple Cotton is the "Buyer," that it signed the contract as "Buyer," and that defendant knew that it was the Buyer, they base their conclusion that the contract is ambiguous on the fact that in three places Staple Cotton also is referred to as "agent."
The evidence shows that ordinarily the plaintiff association negotiates a sale of the grower's cotton to a third party, but that occasionally plaintiff itself purchases the cotton from the grower. Since the producer's cotton ordinarily is sold to a third party, the printed form of the Sale and Purchase Agreement generally is worded for that type of transaction, showing the name of the "Buyer," usually a third party, and in three places it indicates that the association is acting as "agent." The contract does not specify that Staple Cotton is acting as agent for the Seller alone, but instead it provides that it is to act as agent for both the Seller and the Buyer for the purpose of completing the sale and maintaining records of that transaction. That is apparent from the two paragraphs of the Sale and Purchase Agreement which are quoted in the majority opinion.
In the instant suit, when plaintiff itself purchased defendant's cotton crop, the parties used the same form of Sale and Purchase Agreement which had been prepared for sales to third persons, and they merely inserted the name of the plaintiff association, instead of a third party, as the "Buyer." Each of the two Sale and Purchase Agreements involved in this suit thus show unquestionably that plaintiff is the Buyer, although in three places it also is referred to as an agent. I think, and apparently the trial judge thought, that the contract is so clear and unambiguous to the effect that Staple Cotton is the "Buyer" that to me it is inconceivable that Pickett, or anyone else, could interpret the contract in any other way. But, aside from the fact that the contract itself shows clearly that plaintiff is the "Buyer," Pickett makes it plain in his testimony that he knew that Staple Cotton was the buyer. He simply interpreted the contract (erroneously I think) as meaning that since he was a member of the association, he could back out of any contract to sell his cotton when the time came for him to deliver to the Buyer, whether the buyer was Staple Cotton or anyone else, and that he would suffer only a penalty of five cents per pound if he did so.
Neither the law nor the Marketing Agreement prohibit plaintiff from purchasing cotton from the defendant producer. The evidence shows that Staple Cotton agreed to pay Pickett the best price obtainable for his cotton on the day the Sale and Purchase Agreement was signed. Pickett voluntarily consented to that sale, with full knowledge of all of the circumstances. There was no question in Pickett's mind that if the price went down he could enforce specific performance against Staple Cotton, and I believe he understood that Staple Cotton also could enforce specific performance against him. None of the parties, of course, expected the price of cotton to go up as high as it did, but when the price did go up, he consulted an attorney to see if there was a way he could avoid his obligation under the agreement.
The evidence shows that Pickett was familiar with this type of transaction. In the spring of 1972, he entered into a Marketing Agreement with Staple Cotton identical to the one involved in this case, and he also sold his cotton crop by means of a Forward Sales Contract, using the same form of Sale and Purchase Agreement which is at issue here, although he sold to W. B. Dunavant & Company instead of to plaintiff. It is obvious from his testimony that he felt that he could refuse to deliver his 1972 crop to Dunavant, and that he would only have to pay liquidated damages of five cents per pound in that case. He stated that he "went on through with" the 1972 contract (obviously because the price *621 of cotton did not go up that year), but that he decided not to honor the 1973 agreements when he found that he could make more money by refusing to deliver to Staple Cotton and selling his crop to someone else. He explained in his testimony that he had heard of some cotton buyers who "got out of the contract" in 1972 by declaring bankruptcy, so he consulted an attorney to see if he could get out of his 1973 contract. His testimony is:
". . . the contract in 1973 was identical to the 1972 crop and I had signed the two marketing contracts and the twelve marketing agreements and it plainly said that if I didn't deliver this cotton I would pay five cents a pound and when cotton went above the thirty cents that I was guaranteed in 1973 and after it did I figured what was good for the gooseI heard all this talk about contracts here, there and yonder, court cases and everything else and all the buyers in 1972 that declared bankruptcy and got out of the contract, I figured what was good for the goose was good for the gander too and that's when I consulted my attorney, Mr. DeJean."

I believe that the Marketing Agreements entered into by the parties did not modify the Sale and Purchase Agreements, that Staple Cotton was the buyer of Pickett's 1973 cotton crop, and that the rights and obligations of plaintiff and defendant under the Sale and Purchase Agreements involved here are the same as would have existed between the purchaser and seller if a third party had been the "buyer" instead of plaintiff. I find no ambiguity in the contracts and no breach of a fiduciary relationship by plaintiff. The provisions in the Sale and Purchase Agreements which refer to Staple Cotton as "agent" are not inconsistent with its position as a "Buyer," and the contracts are clear and unambiguous whether those provisions are given full effect or are regarded as surplusage. Plaintiff, as the buyer of defendant's 1973 cotton crop, has the right to compel specific performance of the Sale and Purchase Agreements.
If the majority opinion is allowed to stand, it will have the effect of preventing cooperative marketing associations, such as Staple Cotton, from purchasing the crops produced by its own members, even though the member-producer wants to sell to the association.
In my opinion the trial judge correctly decided the case, and I would affirm the judgment appealed from.
For these reasons I respectfully dissent.
NOTES
[1] The Sale and Purchase Agreements entered into by the parties in 1972 and 1973 were referred to by some of the witnesses as "Forward Sale Contracts," because the entire cotton crop from each farm is sole and the price is agreed upon before the cotton is harvested or produced. The evidence shows that it is a common practice in that business to sell cotton crops before the cotton is produced by means of such "Forward Sale Contracts." Such a practice assures the grower of receiving the agreed price for his cotton after it is harvested, and it assures the purchaser of obtaining the cotton at that price, regardless of market fluctuations in the price of cotton.
[2] These were forwarded in one envelope under one cover letter, which reads as follows:
 "March 13, 1973
"J. A. Pickett, Sr.
Box 117
Morrow, Louisiana 71356

"Dear Mr. Pickett:
"We are enclosing the Sales and Purchase Agreement's covering your 1973 cotton crop and ask that you sign all copies. The blue copies are to be retained for your files. Please return the original's and green copies to our office in Winnsboro.
"We are also enclosing Marketing Agreement's and ask that you check these forms for correctness, sign, keep the yellow copies for your records and return along with the above contract.
"Thank you for the opportunity of handling your cotton again this season.
 "Yours truly,
 STAPLCOTN
 /s/ Mike Kilpatrick
 Mike Kilpatrick
 Manager"