## MOORE *v.* HAMPTON et al.

A sale made by a sheriff, under an agreement of parties, and on terms different from those prescribed by law for forced sales, will not be viewed as a forced sale, but as subject to the rules of ordinary sales, in which the vendor is bound to express himself clearly respecting the thing to be sold, under the pain of having any obscure or ambiguous clause construed against him.

After possession for twenty years by a purchaser under a sale made by one acting as an agent, the authority of the agent cannot be contested.

The rule established by art. 2256 of the Civil Code, prohibiting the admission of parol testimony to contradict or enlarge valid written acts, will not exclude such evidence when adduced to identify land sold, where the titles contain no specific description of the property. Such evidence explains and elucidates the title; but goes neither against nor beyond it.

MOORE
*v.*
HAMPTON.

APPEAL from the Fifth District Court of New Orleans, *Buchanan*, J. *Benjamin* and *Micou*, for the appellant. *Preston* and *Ilsley*, for the defendants. The judgment of the court was pronounced by

Rost, J. This is a petitory action: The plaintiff claims as universal legatee of her first husband, *Wm. Donaldson*, the undivided half of a tract of land, formerly held in common between the said *Donaldson* and *John W. Scott*. The defendants allege that the title of *Donaldson* was divested by a sheriff's sale, as far back as the 10th of November, 1815, being thirty years save a day previous to the institution of this suit. They further allege that their ancestor, *Wade Hampton*, acquired the said property by authentic act, from *Carlos De Armas*, the purchaser at the sheriff's sale. They have pleaded the prescriptions of ten, twenty, and thirty years.

The material facts of the case are as follows : Before the change of government, *Conway* had obtained a complete grant for ninety-six *arpents* front of land on the Mississippi river, by forty *arpents* in depth, with diverging side lines. He had also applied for and obtained a grant for an indefinite extent of vacant lands included within the prolongation of his side lines. *Scott* and *Donaldson*, subsequently acquired a portion of all these lands, and formed a partnership, by notarial act, in relation to them. They afterwards made a partition of the front tract to the depth of eighty *arpents*, and took possession of their respective shares. The lands in the rear being yet undefined, and not having been separated from the public domain by an actual survey, continued in common between them under their contract of partnership, and they established a steam saw-mill on what they supposed to be the extreme north west corner of them. After the change of government, they obtained from Governor *Claiborne*, then exercising the powers of the spanish Intendant General, an order for the survey of these lands, and, in obedience to this order, a plat of them appears to have been made by the surveyor *Lafon*, extending to bayou Manchac, and including the seat of the saw-mill. Up to this time the title was incomplete, on account of its uncertainty as to boundaries and extent. On the 28th of August, 1813, *Donaldson* being indebted in a large sum to the succession of *Daniel Clarke*, and being anxious, as he states in the act, to do all in his power to protect the succession, mortgaged to the executors his share of the front lands, with seven slaves employed thereon, and also an undivided half part of the steam saw-mill, owned jointly by the mortgagor and the heirs of *John W. Scott*, then deceased, together with an undivided half part of a tract of land on which said mill is placed, and also twenty-slaves employed at the mill. *Donaldson* having died without paying the debt, *Clarke's* executors obtained a judgment upon it for the sum of $30,338, and all the property mortgaged was ordered to be sold.

An agreement was then entered into between the executors of *Clarke*, the heirs of *Scott*, and the executor of *Donaldson*, styling himself also the attorney of the present plaintiff, who was the universal legatee of the said *Donaldson*. By this agreement the sheriff of the parish of Iberville was authorized to make sale of the whole of the steam saw-mill and of the tract of land whereon the

same was placed, which tract of land is stated in the act to be held in common between the heirs of *Donaldson* and the heirs of *Scott*, and the same one undivided half of which was ordered by the decree to be sold to satisfy the plaintiff's debt, under the mortgage made to them by *Wm. Donaldson.* The parties farther agreed that the sale should be made on a credit of one and two years, the sheriff taking good security and mortgage on the property sold. This agreement appears to have been made the judgment of the court, and in conformity therewith the saw-mill and the tract of land were sold by the sheriff, and adjudicated to *Carlos De Armas.*

Sometime after, *Carlos De Armas* sold to *Wade Hampton,* " the undivided half part of all that certain steam saw-mill, situated in the parish of Iberville, and also the undivided half part of all that certain tract of land on which the said mill is placed, and which was sold at sheriff's sale on the 16th day of November, 1815, as the property of the late *John W. Scott;* the other half of said property, having previously been sold by the vendor to the purchaser, this being, says the act, all the remaining or residuary right, title and interest which the vendor holds in or to the property *above mentioned, described, or alluded to.* After this sale *Patrick Wale,* the executor of *Donaldson,* delivered the title deeds in his possession to *Hampton,* and wrote to him, "they now belong to you, and are only useful to you." Since this sale, *Hampton* and his heirs have been in possession of the whole tract of land, without opposition or hindrance on the part of the plaintiff.

The plaintiff now alleges that the claim has been confirmed and patented by the United States ; that it embraces about 34,000 superficial acres, and extends through two parishes; that the tract of land on which the saw-mill was placed must be understood as having reference to some inconsiderable portion of the grant, and cannot by any fair rule of construction be made to embrace the whole it. There was a judgment against her in the first instance, and she has appealed.

Her counsel contend : *First,* That the title of the defendants is a forced sale under which nothing passes, unless it contains such a description of the thing sold as will identify it. *Second,* That the title of the defendants is by itself too vague and indefinite to convey any part of the land in controversy, and that evidence *aliunde* is not admissible to enlarge or extend it. *Third,* That the evidence in the record, not eminating from the defendants' themselves or their ancestors, would not, if admitted, support their claim.

Should these grounds be well taken, so far as to leave us nothing to act upon save the mortgage given to the executors of *Clarke,* the evidence of the circumstances under which it was given, the will of *Donaldson,* and an ordinary judicial sale of the property mortgaged, it would still be proved that *Donaldson* did mortgage one equal undivided half part of the steam saw-mill, owned jointly by him and the heirs of *John W. Scott,* together with an undivided half part of a tract of land on which said mill was placed; and that he owned at the time, jointly with the heirs of *Scott,* and in equal shares, the back lands within the prolongation of their side lines, covered by the last grant made to *Conway,* on the extremety of which the mill was placed ; and as the plaintiff has failed to show that any portion of the land covered by this grant had been set apart by *Donaldson* and *Scott* and attached to the saw-mill, effect could not be given to the mortgage unless *Donaldson* was held to have mortgaged the whole. Any obscure or ambiguous clause would of course be construed against him, in order

to prevent such a result. It would further have been shown that property was at the time much depressed in value, that the debt due by *Donaldson* was large, and that he was willing and anxious to secure and pay it. Even under that state of facts we would find little difficulty in coming to the conclusion that he intended to give, and did give, to the executors of *Daniel Clarke*, all the security in his power; he says expressly that he did, in the act of mortgage. Lands such as those embraced in this grant were then of very little value, and no reasonable doubt can exist that, in the contemplation of the parties, the sawmill and the slaves were the principal object mortgaged, and the land a mere accessory. Under the spanish colonial government, even as late as 1816, the usual quantity of land granted, in consideration of the erection of a saw-mill, was twenty-five square miles. The validity of a grant of that description was recognized by the Supreme Court of the United States, in the case of the *United States* v. *Sibbald*, 10 Peters, 314. Such was then the meaning of a saw-mill tract.

But we do not assent to the propositions assumed and urged upon us by the plaintiff's counsel. The sale made by the sheriff took place [under an agreement of the parties, and on terms different from those prescribed by law for forced sales. The plaintiff did not herself sign that agreement; but she could not after twenty years contest the authority of the agent who represented her therein, even if her direct participation in those proceedings did not appear, as it does, by her subsequent agreement annulling the sale made by the sheriff of the parish of Ascension of the remainder of the property, and making provision for its resale by the sheriff of the parish of Orleans. *Bedford* v. *Urquhart*, 8 La. 248. *Bourguignon.* v. *Boudousquié*, 6 Mart. N. S. 153.

The interlocutory decree entered upon that agreement was nothing more than the authentication of it, and the sale made under it was not a forced sale. The purchaser derived his title, not from justice, though its officer pursuing the strict forms of law, but from the consent of the owners that the sheriff should sell on terms which they prescribed. *Union Bank* v. *Marin*, ante p. 34. This was a public sale, subject to the rules of ordinary sales. The vendors were bound to express themselves clearly respecting the thing to be sold; and any obscure, ambiguous, or doubtful clause, should be construed against them.

Another consequence of the agreement is, that the sheriff of the parish of Iberville was authorized to sell any portion of the back lands situated in the parish of Ascension, as, by another agreement, the front lands in the parish of Ascension were sold in the parish of Orleans.

When this sale took place the rule was as it is now, that no parol evidence is admissible against or beyond what is contained in written acts, nor on what may have been said before or at the time of making said acts. It is substantially the same as that of the common law, that parol, contemporaneous evidence is inadmissible to contradict or vary the terms of a valid written instrument; and the same interpretation appears to have been given to both by the civil and common law courts.

Under our rule, the evidence is said to be *against* the act, when it is introduced to prove the falsity of what is therein stated. It is said to be *beyond* the act, if the object of it be to add to the act a clause which it does not contain, or to enlarge those which it does contain. But when titles to land contain no specific description of the property conveyed, as in this case, the question of

MOORE
*v.*
HAMPTON,

ownership can only be determined by the application of the title to the land, and by parol evidence. It is conceded that some land was mortgaged and sold with the saw-mill. The evidence adduced for the purpose of identifying the thing sold, explains and elucidates the title, and goes neither *against* nor *beyond* it. The facts it establishes are analogous to those of extent and boundary. Dalloz, An. 1837, 1st part, p. 239.

At common law, parol evidence is always admitted to ascertain the nature and qualities of the subject to which the written contract refers; and, while the controversy is between the original parties or their representatives, all contemporaneous writings relating to the same subject matter are legal evidence. 1 Greenleaf, Evidence, nos. 282, 283, 286. *Barnes* v. *Mawson*, 1 Maule & Selwyn, 77.

We consider the letters of *Patrick Wale*, and the parol evidence introduced by the plaintiff, as properly before us. This testimony clearly proves that the whole of the back-lands were designated by *Donaldson* and *Scott*, and known in the neighborhood as the saw-mill tract. It identifies the land mortgaged by *Donaldson*, and is corroboratad by the letters of *Wale*, by the agreement of parties under which the sale of the land took place, and by the description given of the property in the sale from *De Armas* to *Hampton*. *Morgan* v. *Living-ston*, 6 Martin, 19.

If all the property of *Donaldson* had not been mortgaged and sold, it is not to be believed that the plaintiff would not long ere this have caused a sale of the remainder to be made, for the purpose, if for no other, of securing to herself means of support, which it is admitted she had not. Her long acquiescence in the possession of *Hampton*, under all the circumstances of the case, is conclusive against her as to the extent of land mortgaged and sold.

*Judgment affirmed.*