**Alice Shilling LAPEZE, et al.**

v.

**AMOCO PRODUCTION COMPANY.**

Civ. A. No. 82–665–B.

United States District Court,
M.D. Louisiana.

Mar. 3, 1987.

Charles A. Landry, Gary & Field, Baton Rouge, La., for Hiram L. Shilling.

Ronald Causey, Baton Rouge, La., for Intervenor.

R. Gordon Kean, Jr., Leonard L. Kilgore, III, Kean, Miller, Hawthorne, D'Armoni McCowan & Jarman, Baton Rouge, La., for Amoco Production Co.

POLOZOLA, District Judge:

Alice S. Lapeze and Hiram L. Shilling have filed this suit seeking to cancel an oil, gas and mineral lease executed by their father, Eugene Shilling, in favor of Amoco Production Company (hereinafter "Amoco").[1] This lease was executed on March 3, 1976 and was for a term of five years. The lease contained a provision stating that it would terminate on March 3, 1977, unless Amoco either commenced operations for the production of minerals or paid a rental of $5.00 per acre for each acre it elected to hold under the lease.[2] The lease further provided that rental payments were to be made to the lessor or deposited in the Livingston State Bank of Denham Springs which was named the depository of the lessor and his successors and assigns.[3] In accordance with paragraph 1 of the lease, Amoco presented annual rental checks, payable to Eugene Shilling, in the sum of $223.73 [4] to Livingston State Bank on February 14, 1977, 1978, 1979 and 1980.

The lease covered two tracts of land located in Livingston Parish. It contained an erroneous property description on one of the tracts. This tract, containing approximately 29.7 acres of land, was acquired by Eugene Shilling in a partition with his brother, Eddie Shilling. The Act of Partition, executed March 3, 1972, contained an error in the property description. The property description contained in the Act of Partition was used to describe the same tract in the lease. Thus, the erroneous land description was perpetuated in the lease.[5] On January 17, 1980, Eddie Shilling, Alice S. Lapeze, Hiram L. Shilling, and Louisa C. Shilling, the surviving spouse of Eugene Shilling,[6] executed an Act of Correction to the 1972 Act of Partition. In this Act of Correction, the erroneous property description was corrected.

1. This suit was originally filed by Alice S. Lapeze. Thereafter, Hiram L. Shilling intervened in the suit. For purposes of this opinion, both parties will be referred to as plaintiffs.

2. Paragraph 1 of the lease provides, in pertinent part, as follows:
    This lease shall terminate on March 3, 1977, unless on or before said date the Lessee either (1) commences operations for the drilling of a well on the land, or on acreage pooled therewith (or with any part thereof), in search of oil, gas or other minerals and thereafter continues such operations and drilling to completion or abandonment; or (2) pays to the Lessor, a rental of Five and No/100 Dollars ($5.00) per acre for all or that part of the land which Lessee elects to continue to hold hereunder....

3. Paragraph 1 of the lease provides, in pertinent part, as follows:
    Payments may be made to the Lessor or may be mailed or delivered for deposit to Lessor's credit in the Livingston State Bank of Denham Springs, Louisiana, which bank or its successor shall continue to be the depository for such rentals as the representative of Lessor and Lessor's successors and assigns; and the death or incapacity of Lessor shall not terminate or affect Lessee's right to continue to deposit all payments in said depository bank or its successor. The mailing of the check or draft of Lessee or Lessee's successors to Lessor at the address set forth above or to the said bank on or before the rental paying date shall be considered as payment of rental and operate to maintain Lessee's rights in force and effect.

4. $222.75 was paid to the lessors and one dollar was paid to the bank for a handling fee.

5. Plaintiffs contend there is no testimony as to the origin of the error in the property description in the lease. Although there may be no "testimony" on this issue, there is evidence to support the court's finding. Defendant's exhibit No. 3 is a copy of the 1972 partition. The description of the 29.7 acre tract which Eugene Shilling acquired is exactly the same as the description of 29.7 acre tract set forth in the 1976 lease.

6. Eugene Shilling died on June 18, 1979.

Amoco filed suit on June 10, 1980 for the reformation of the 1976 lease to reflect the corrected property description which was set forth in the Act of Correction to the Act of Partition. After that suit was filed, a settlement was reached by the parties which resulted in an Act of Correction to the 1976 lease. This Act of Correction which was executed on September 24, 1980 by Amoco, Louisa C. Shilling and the plaintiffs, amended the 1976 lease to correctly describe the leased property and increased the royalty payments from 1/8 to 1/6. In reference to the 1976 lease, the Act of Correction expressly stated that "[e]xcept as herein specifically amended and corrected, the Oil, Gas and Mineral Lease of March 3, 1976 and the amendment thereto, described above, shall remain in effect as originally executed."

On July 15, 1981, the plaintiffs petitioned for and were granted a judgment of possession by the state court which recognized their ownership of, and placed them in possession of Eugene Shillings' 1/2 undivided interest of the property belonging to the community of acquets and gains which formerly existed between Louis Eugene Shilling and Eva Louisa Comeaux Shilling subject to the usufruct of their mother. Plaintiffs were also placed in possession of the property belonging to the separate estate of their father.

During the primary term of the lease, Amoco began operations for the production of minerals on plaintiffs' property which had been unitized with the property of other landowners. The work of Miley Well No. 1 was completed on May 20, 1981. On the next day, the Miley Well was "shut-in." Under the terms of the lease, Amoco could maintain its rights after a well has been "shut-in" by the resumption of payments within ninety days of such "shut-in" at the rate and manner provided for rental payments on the lease.[7] On August 5, 1981, the Livingston Bank and Trust Company, successor to Livingston State Bank, received and negotiated a check, dated August 3, 1981, numbered R1979354 which had been submitted by Amoco in accordance with the terms of the lease. The stub on the check stated that the check was "In Payment of Rental due party or parties named below ...;" The stub named "Eugene Shilling" as the payee of the check. The bank deposited the check into an account numbered No. 177–216–3 which was an account maintained by the bank in the name of "Mr. and Mrs. Eugene Shilling" or "M/M Eugene Shilling." In November or December of 1981, Lapeze discovered the payment while reconciling her mother's checks with a bank statement. In January of 1982, Amoco was contacted concerning this payment by Patrick Pendley who was then representing the plaintiffs. In response to Pendley's inquiry, Amoco identified the check as a "shut-in" payment due

---

7. Paragraph 6 of the lease provides, in pertinent part, as follows:

In the event that any well on the land or on property pooled therewith (or with any part thereof), is capable of producing gas or gaseous substances in paying quantities but such minerals are not being produced then Lessee's rights may be maintained, in the absence of production or drilling operations, by commencing or resuming rental payments as hereinabove provided for in connection with the abandonment of wells drilled. Should such conditions occur or exist at the end of or after the primary term, or within ninety (90) days prior to the expiration thereof, Lessee's rights may be extended beyond and after the primary term by the commencement, resumption or continuance of such payments at the rate and in the manner herein provided for rental payments during the primary term, and for the purpose of computing and making such payments and expiration date of the primary term and each anniversary date thereof shall be considered as a fixed rental paying date; provided, however, that in no event shall Lessee's rights be so extended by rental payments and without drilling operations or production of oil, gas or some other mineral for more than five consecutive years.

Paragraph 4 of the lease provides for the payment of rentals in connection with the abandonment of wells drilled as follows:

... operations may be discontinued and the right granted maintained by commencing or resuming rental payments, by paying within ninety (90) days from the discontinuance of operations (regardless of the fixed rental paying date) the proportion of the fixed yearly rental that the number of days between the end of said ninety (90) days and the next ensuing rental paying date or the expiration of the primary term bears to the twelve months period....

pursuant to the lease on February 8, 1982. In May of 1982, Lapeze requested the lease be cancelled because the aforementioned "shut-in" payment had not been paid to the proper persons. When Amoco refused her request, this suit was filed. Thereafter, Hiram L. Shilling was granted leave to intervene in the present suit after Amoco refused his request to cancel the lease.

The plaintiffs contend that Amoco failed to properly pay shut-in rentals which were due under the lease and that such failure automatically terminated the lease. Specifically, the plaintiffs contend that the shut-in rentals were incorrectly paid because Amoco instructed Livingston Bank and Trust Company, successor to Livingston State Bank, to deposit the rental check in question to Eugene Shilling's credit instead of to the credit of the plaintiffs. Amoco denies plaintiffs' contention and states that paragraph 9 of the lease authorized it to continue to pay monies due under the lease to the credit of Eugene Shilling after his death. Paragraph 9 of the lease provides, in pertinent part, as follows:

9. All provisions hereof shall inure to the benefit of and bind successors and assigns (in whole or in part) of Lessor and Lessee, (whether by sale, inheritance, assignment, sublease or otherwise), but regardless of any actual or constructive notice thereof, no change in the ownership of the land or any interest therein or change in the capacity or status of Lessor or any other owner or rights hereunder, whether resulting from sale or other transfer, inheritance, interdiction, emancipation, attainment of majority or otherwise shall impose any additional burden on Lessee, or be binding on Lessee for making any payments hereunder unless, at least forty-five (45) days before any such payment is due, the record owner of this lease shall have been furnished with certified copy of recorded instrument or judgment evidencing such sale, transfer or inheritance, or with evidence of such change in status or capacity of Lessor or other party owning rights hereunder.[8]

In response to Amoco's contention, plaintiffs argue that paragraph 9 is not applicable under the facts of this case because of an Act of Correction entered into by Amoco, Louisa Shilling and the plaintiffs on September 24, 1980. Furthermore, the plaintiffs assert that even if paragraph 9 of the lease is applicable, the lessee was furnished with the evidence required by paragraph 9 and, therefore, the rental payment should have been paid to them or their credit rather than to the credit of Eugene Shilling. The court will discuss each of the parties' contentions.

I. Has the Act of Correction of September 24, 1980 Abrogated the Provisions of Paragraph 9 of the Original Lease?

The plaintiffs contend that the Act of Correction entered into on September 24, 1980 by Amoco, Louisa Shilling and the plaintiffs rendered the provisions of paragraph 9 of the original lease inapplicable. In essence, the plaintiffs assert that the legal effect of the Act of Correction was to recognize them as the lessors in the lease. Since the plaintiffs were to be recognized as the lessors in the original lease as a result of the Act of Correction, plaintiffs

---

**8.** Paragraph 9 of the lease continues to provide as follows:

The furnishing of such evidence shall not affect the validity of payments theretofore made in advance. A sublease may as to the Lessor, exercise the rights and discharge the obligations of the Lessee, without joinder of any sublessor. In the event of an assignment of the lease as to a segregated portion of the land, delay rentals shall be apportioned among the several leasehold owners according to the surface area of each, and default in payment by one shall not affect the rights of others. Any owner of rights under this lease may pay the entire rental payable hereunder and such payment shall be for the benefit of those having leasehold rights hereunder. If at any time two or more persons are entitled to participate in the rental payable hereunder, Lessee may pay or tender said rental jointly to such persons or to their joint credit in the depository named herein; or, at Lessee's election, the proportionate part of said rental to which each participate is entitled may be paid or tendered to him separately or to his separate credit in said depository and payment or tender to any participant of his portion of the rentals hereunder shall maintain this lease as to such participant.

argue that paragraph 9 is inapplicable except to authorize Amoco to make payments due under such lease to the plaintiffs' credit, despite changes in ownership or capacity, until proper notification has been given.

■ This contention is without merit. Plaintiffs seek to introduce parol evidence to support their interpretation of the various rights and agreements between the parties. Article 2276 of the Louisiana Civil Code [9] provides that "[n]either shall parol evidence be admitted against or beyond what is contained in the acts, nor on what may have been said before, or at the time of making them, or since." The original lease and Act of Correction executed on September 24, 1980 are both authentic acts.[10] Authentic acts have been held to be "acts" as that term is used in article 2276.[11] Therefore, since the contracts at issue in this case are authentic acts, the parol evidence rule applies.[12]

■ The prohibitions of articles 2276 against the admissibility of extrinsic evidence are applicable only when the evidence that is offered is "against or beyond the terms of the act." [13] In the present case, the court finds that evidence has been submitted that is both "against" and "beyond" the terms of the Act of Correction. In *Moore v. Hampton*, 3 La.Ann. 192, 195 (1848), the Louisiana Supreme Court, in interpreting these phrases in Louisiana Civil Code article 2256 [the precursor to article 2276], stated:

> Under our rule, the evidence is said to be against the act, when it is introduced to prove the falsity of what is therein stated. It is said to be beyond the act, if the object of it be to add to the act a

---

9. Titles III and IV and Book III of the Civil Code of 1870, which contained Civil Code articles 1756 to 2291, were amended and reenacted by Acts 1984, No. 331, to contain Civil Code articles 1756 to 2057, effective January 1, 1985. Throughout this opinion the article used in the text will be the number of the article as it existed prior to this amendment and reenactment. However, the present number and/or text of the article will be set forth in a corresponding footnote.

  Louisiana Civil Code article 2276 is now Civil Code article 1848 which provides:

  Testimonial or other evidence may not be admitted to negate or vary the contents of an authentic act or an act under private signature. Nevertheless, in the interest of justice, that evidence may be admitted to prove such circumstances as a vice of consent, or a simulation, or to prove that the written act was modified by a subsequent and valid oral agreement.

10. See La.C.C. art. 1833, which was formerly La.C.C. art. 2234.

11. *Smith v. Bell*, 224 La. 1, 68 So.2d 737 (1953); *Templet v. Babbitt*, 198 La. 810, 5 So.2d 13 (1941).

12. There is some confusion in the jurisprudence as to whether the Louisiana parol evidence rule, despite its name, is evidentiary or substantive in nature. This issue has come up on the context of whether a failure to object to the admissibility of parol evidence, as an evidentiary rule, constitutes a waiver and, therefore, may not later be used to exclude such evidence. In *Little v. Haik*, 246 La. 121, 163 So.2d 558 (1964), the Louisiana Supreme Court reconsidered *In re Industrial Homestead Ass'n*, 198 So. 528 (La.App. Orl.1940) which had held that if parol evidence as to interests in immovables is introduced without objection, it may be considered. The Court impliedly overruled this jurisprudence by holding that inadmissible parol evidence introduced without objection cannot be considered where the defendant has made a denial under former La.C.C. art. 2275, because the law disallows such proof. A later circuit case, *Wade v. Joffrion*, 387 So.2d 1265 (La.App. 1st Cir.1980), limited the *Haik* decision by holding that *Haik* was not based upon the evidentiary nature of 2276 but upon the substantive requirement of 2275 which requires that transfers of immovables be in writing. Other circuits have also held that Louisiana's parol evidence rule is evidentiary in nature. See *Newman v. Cary*, 466 So.2d 774 (La.App. 4th Cir.1985); *First National Bank of Ruston v. Mercer*, 448 So.2d 1369 (La. App. 2d Cir.1984). Whether it is evidentiary in nature and, therefore, requires the application of present Article 1848, or substantive and, therefore, requires the application of former Article 2276, evidence to vary, negate or go beyond or against what is contained in the original lease or the Act of Correction of September 24, 1980, will not be admitted or considered because objections were made at the trial. Because the court finds that the law has been essentially unchanged by the enactment of present article 1848, the court has relied upon jurisprudence interpreting former article 2276 for its analysis.

13. See also Note, "Louisiana's Parol Evidence Rule: Civil Code Article 2276," 35 La.L.Rev. 779, 784 (1975).

clause which it does not contain, or to enlarge those which it does contain.

The plaintiffs argue that the settlement agreement which was entered into by the plaintiffs, Louisa Shilling and Amoco to settle the lawsuit Amoco filed to reform the lease now defines the lease relationship between Amoco and the plaintiffs. Although the terms of such settlement agreement are found only within the documents of the original lease and the Act of Correction, plaintiffs contend the legal relationship created by the settlement agreement is that the plaintiffs are the lessors and Amoco is the lessee. The court finds no reason to discuss the validity of the plaintiff's argument that the evidence supports the conclusion that they are now the "lessors" because the court finds that such evidence is inadmissible under article 2276. The Act of Correction sets forth that it was the signatories' intention to accomplish two things by executing the Act of Correction: (1) to correctly describe the property which was the subject of the original lease; [14] and, (2) to increase the royalty from one-eighth to one-sixth. When interpreting a contract, a court is required to determine the intent of the parties from the words of the contract "when these words are clear and explicit and lead to no absurd consequences." [15] Since the contract at issue clearly and explicitly states the intent of the signatories, the court can not interpret the contract to have a broader intent than was stated. If the parties to the Act of Correction had wanted to substitute the plaintiffs as the lessors in the original lease, the parties could have worded the Act of Correction to so state this intent. The plaintiffs also argue that since the Act of Correction contains a clause which provides that "Louisa C. Shilling, Alice Eugenia S. Lapeze and Hiram L. Shilling, the surviving spouse and sole heirs of Eugene Shilling, hereinafter *called Lessors,*" [16] such language did substitute the plaintiffs as the lessors in the original lease. The court finds that this interpretation is in direct conflict with the parties' stated intent contained in the Act of Correction.[17] If the stated intent is only to correct the property description and to increase the royalty, the court would be expanding the intent of the parties if it interpreted the contract to also include the intent to substitute the plaintiffs as the lessors in the original lease.[18] The court's conclusion is supported by the following provision contained in the Act of Correction which provides: "[e]xcept as herein specifically amended and corrected, the Oil, Gas and Mineral Lease of March 3, 1976 and the amendment thereto, described above [dated August 2, 1976], shall remain in effect as originally executed." Therefore, in accordance with applicable codal provisions and jurisprudence, the court finds that after considering the whole agreement, the court interprets the phrase "hereafter called Lessors" as a mechanism whereby Louisa Shilling, Alice Eugenia S. Lapeze and Hiram L. Lapeze could be referred to by a single word in the Act of Correction and not as an attempt to substitute the plaintiffs as the lessors in the original lease.

**14.** The plaintiffs' contention that since the wording of the "Mother Hubbard Clause" has been changed in the Act of Correction, the parties had somehow "strayed" from such initial intent with regard to the scope of the Act of Correction is without merit. The rewording of the "Mother Hubbard Clause" was a necessary consequence to reflect the change in the property descriptions contained in the Act of Correction.

**15.** Louisiana Civil Code article 1945, now articles 2045 and 2046; *Battig v. Hartford Acc. & Indem. Co.,* 482 F.Supp. 338 (W.D.La.1977), *affirmed* 608 F.2d 119 (5th Cir.1979); *Texaco, Inc. v. Newton and Rosa Smith Charitable Trust,* 471 So.2d 877 (La.App. 2d Cir.1985); *National Roofing and Siding Co., Inc. v. Giaise,* 434 So.2d 85 (La.App. 5th Cir.1982), *writ denied* 435 So.2d

443 (1983); *Ericksen, Krentel & Barre v. Pizzolato Ford-Lincoln-Mercury, Inc.,* 432 So.2d 386 (La. App. 1st Cir.1983); *Saucier v. John-Clai Co.,* 408 So.2d 27 (La.App. 3rd Cir.1981).

**16.** Emphasis supplied by the court.

**17.** As provided in Louisiana Civil Code article 1955, now article 2050, "[a]ll clauses of agreements are interpreted the one by the other, giving to each the sense that results from the entire act." *See also Makofsky v. Cunningham,* 576 F.2d 1223 (5th Cir.1978); *Harper v. Intracoastal Truck Lines,* 451 So.2d 1289 (La.App. 1st Cir.1984).

**18.** See the *Battig, Smith Trust, Giaise* cases, supra note 15.

Plaintiffs raise one final argument in support of their contention that the Act of Correction abrogated the provisions of paragraph 9 of the original lease. The plaintiffs contend that they could not have contracted to amend the original lease unless they were parties to it. Since the only two parties to a lease are the lessor and the lessee and Amoco is the lessee, the plaintiffs contend that they must be considered the "lessors". This contention is based upon Louisiana Civil Code article 1945,[19] which, in pertinent part provides that "[l]egal agreements having the effects of law upon parties can abrogate or modify them." [20] In opposition to this contention, Amoco relies upon *Hooper v. Miller*, 12 La.App. 9, 11, 125 So. 77, 78 (La.App. 1st Cir.1929). In *Hooper* the Court held that there was no prohibition either upon moral grounds or upon public policy grounds, against an heir agreeing with other parties to modify a written contract entered into by his ancestor and such other parties to reflect the true intentions of the signatories to the original act.[21] The plaintiffs argue that this statement by the *Hooper* Court is dicta but it nonetheless supports their position, i.e., that an heir, by operation of law takes his ancestor's place as a party to the contract into which the ancestor had entered and, therefore, under article 1945, the heir may modify the contract. Whether or not such assertion by the *Hooper* Court is dicta, the court agrees that an heir, as such, can agree with other parties to modify a contract of his ancestors. However, the validity of such modification of an ancestor's contract would necessarily depend upon the "modifier's" ultimate status. Therefore, the fact that Louisa Shilling, as the surviving spouse, the plaintiffs, as the heirs of Eugene Shilling, and Amoco entered into a contract, i.e. the Act of Correction, to amend the lease entered into by Eugene Shilling and Amoco in 1976 is not

sufficient, in and of itself, to conclude that the plaintiffs are "the lessors."

## II. Have the Provisions of Paragraph 9 of the Original Lease Been Met?

The plaintiffs argue that even if the Act of Correction did not abrogate the provisions of paragraph 9, the mineral lease should nonetheless be cancelled because the notice conditions set forth in paragraph 9 have been met. Since the notice requirements of paragraph 9 have been met, plaintiffs contend that Amoco was not entitled to make shut-in payments to the credit of Eugene Shilling but was required to pay the shut-in payments to the credit of Louisa Shilling, Alice Eugenia Shilling Lapese and Hirman R. Shilling to maintain its lease. The court finds that the notice provisons of paragraph 9 of the original mineral lease have not been met by the plaintiffs. Therefore, Amoco acted correctly and in accordance with the terms of the lease by timely making the shut-in payments to the credit of Eugene Shilling.

Paragraph 9 provides, in pertinent part, that:

> ... No change in the ownership of the land ... resulting from ... inheritance ... shall ... be binding on Lessee for making any payments hereunder UNLESS at least forty-five (45) days before any such payment is due, the record owner of this lease shall have been furnished with [a] certified copy of [a] recorded instrument or [a] judgment evidencing such ... inheritance ...

The plaintiffs contend that the "notice" provisions of paragraph 9 have been met because Amoco had received copies of instruments on several occasions which "evidenced" that the plaintiffs were owners of the leased land by virtue of their inheritance of such land from Eugene Shilling. The first recorded instrument which the

---

**19.** Now articles 2045 and 2046 of the Louisiana Civil Code.

**20.** See also Louisiana Civil Code article 1901 of the 1870 Civil Code [now article 1983] and *Medical Adjustment Bureau v. Garrett*, 420 So.2d 223 (La.App. 3rd Cir.1982); *Watson v. Haik*, 393 So.2d 173 (La.App. 1st Cir.1980); *Arceneaux v.*

*Adams*, 366 So.2d 1025 (La.App. 1st Cir.1978), which provide that a contract can be abrogated or modified by the mutual consent of the parties.

**21.** Cf. *Griffith v. Alcocke*, 113 La. 514, 37 So. 47 (La.1904).

plaintiffs claim "evidence" the change of ownership by inheritance was a Correction Deed, dated July 31, 1979, to Robert L. West *et ux* by the plaintiffs.[22] The second instrument relied upon by the plaintiffs as sufficient to "evidence" the change in ownership was an Act of Correction to the 1972 Act of Partition, executed on January 17, 1980, by Eddie Shilling, the plaintiffs and Louisa C. Shilling.[23] The plaintiffs also relied upon the Act of Correction which was previously discussed. Furthermore, the plaintiffs contend that these instruments are sufficient because paragraph 9 does not specify: (1) any particular kind, type or class of instrument; (2) by whom the instrument must be generated; (3) where the instrument must be recorded; or, (4) how the instrument must "evidence" the inheritance. In addition, the plaintiffs argue that the manner in which Amoco received these instruments[24] is sanctioned by paragraph 9 because this paragraph does not specify by whom the instrument must be furnished.

■ Plaintiffs' contention that there has been compliance with paragraph 9 if Amoco has received the necessary document, regardless of the manner in which Amoco received it is without merit. The courts, in interpreting similar provisions in mineral leases, have been consistent in holding that a "lessee is not required to take notice of public records which might show a transfer or assignment by the lessor."[25] In view of this jurisprudence, the court finds that Amoco cannot be found to have been "furnished" with the requisite documents if Amoco acquired them through the acts of its own agents when these agents were reviewing the public records. This conclusion is supported by the provisions of paragraph 9 which provide that "regardless of any actual or constructive notice" of a change in ownership, the lessee is not required to change its method of making payments. Thus, if Amoco has acquired documents which would be sufficient to "evidence" a change in ownership through its own efforts, this "actual" notice would not, by the unambiguous language of paragraph 9, impose any burden upon Amoco to change its method of making payments under the lease. Therefore, the court concludes the Act of Correction granted to Robert L. West and the Act of Correction to the 1972 Act of Partition may not be used by the plaintiffs to demonstrate compliance with paragraph 9.[26] The third document upon which plaintiffs rely, the Act of Correction of September 24, 1980, presents a somewhat different facet to what the court perceives as the same argument. This "different facet" has occurred because the plaintiff did furnish Amoco with a certified copy of this document. During the trial, Robert Morrison, plaintiffs' attorney the time the Act of Correction was executed, testified as follows as to the circumstances surrounding the execution of the Act of Correction:[27]

Q. Now, Mr. Campbell couldn't remember who recorded the Act of Correction and obtained the certified copies. Did

---

**22.** The plaintiffs have submitted evidence that one of Amoco's abstractors saw this instrument. In addition, Amoco's attorney, John W. Haygood, in an opinion dated November 28, 1979, noted that such instrument recited that the plaintiffs and Louisa Shilling were, respectively, the sole heirs and surviving spouse of Eugene Shilling.

**23.** On July 10, 1980 Amoco filed a lawsuit in federal court for reformation of the original lease to incorporate the corrected property description contained in the Act of Correction to the 1972 Act of Partition. Amoco specifically alleged the execution of this amended Act of Partition, reciting the instrument's conveyance book, page and entry numbers, as a basis for its suit to reform the lease.

**24.** Plaintiffs submit that Amoco: (1) "received" the first two documents upon which plaintiffs rely because Amoco's own agents found them in the public records; and (2) "received" the third document because it was a party to such transaction.

**25.** *Pearce v. Southern Natural Gas Co.,* 220 La. 1094, 58 So.2d 396, 398 (1952). *See also Atlantic Ref. Co. v. Shell Oil Co.,* 217 La. 576, 46 So.2d 907 (1950) and *Garelick v. Southwest Gas Producing Co.,* 129 So.2d 520 (La.App. 2d Cir.1961).

**26.** The court has reached this conclusion without deciding the issue of whether either of these instruments would be sufficient to "evidence" a change in ownership.

**27.** See Transcript of Trial, page 220 lines 21–25, page 221 lines 1–15.

you do that or did someone in your office do that or do you know who did that? A. The way the document was transmitted back and forth was that in its finalized form it was it was sent out to my office unexecuted, and at that point I had the Shilling family execute the document. We notarized and witnessed their signatures. And the document was transmitted back to Mr. Campbell's office. And at that point I think he transmitted it to Amoco for their signature, and to the best of my knowledge, it was then sent back to my office. We recorded the deed or the correction and then sent him back the certified copy. And I believe he even, you know, reimbursed us for the recordation expenses of the documents. Q. Did you ever send to Amoco or any of its attorneys a certified copy of a recorded instrument evidencing a change of ownership? A. Well, I sent them this Act of Correction back—this certified copy of this Act of Correction back to Mr. Campbell.

It is upon the last question and answer set forth above that plaintiffs base their claim that if they were required to personally furnish Amoco with a certified copy of a recorded instrument evidencing a change in ownership, they have done so. The court does not agree with the significance that the plaintiffs have placed upon Morrison's transmittal of a certified copy of the Act of Correction to Amoco after he had the document recorded. The transmittal of the certified copy of the Act of Correction to Amoco's attorney was a demonstration that the final step in the execution of the Act of Correction had been accomplished.[28]

 Morrison's testimony that he believed that Amoco had reimbursed him for the recordation expenses of this document supports this interpretation. Paragraph 9 mandates more than the transmittal of a certified copy of a recorded contract from the attorney of one party to the contract to the attorney of the other party to the contract to demonstrate that such contract had been recorded.[29] For these reasons, the court finds that Amoco, as the record owner of the lease, has never been "furnished" with the requisite documents as required by paragraph 9 of the lease. Therefore, there has not been compliance with the notice paragraph 9.[30]

The plaintiffs have the burden of proving the cancellation of the Oil, Gas and Mineral Lease executed by Eugene Shilling and Amoco on March 3, 1976.[31] The plaintiffs have failed to carry their burden of proof.[32] Therefore, this court holds that Amoco has maintained its rights under the Oil, Gas and Mineral Lease of March 1976 by timely depositing at the Livingston Bank & Trust Company, successor to Livingston State Bank, a check numbered R1979354 to the credit of Eugene Shilling in the sum of $223.73.

For these reasons, judgment shall be entered dismissing plaintiffs' suit with prejudice.

28. Agreements affecting immovables are not effective as to third parties until recorded. See La.C.C. art. 1839 which provides, in pertinent part, that "[a]n instrument involving immovable property shall have affect against third persons only from the time it is filed for registry in the parish where the property is located."

29. Paragraph 9 provides that "the record owner of this lease shall have been furnished with [a] certified copy of [a] recorded instrument or judgment evidencing such ... inheritance ..."

30. The court has reached this conclusion without deciding the issue of whether this instru-

ment would be sufficient to "evidence" a change in ownership.

31. *Webb v. Hardage Corp.*, 471 So.2d 889 (La. App. 2d Cir.1985); *Frazier v. Justiss Mears Oil Co.*, 391 So.2d 485 (La.App. 2d Cir.), *writ denied*, 395 So.2d 340 (La.1980).

32. In *McLaurin v. Shell Western E. & P.*, 778 F.2d 235, 237 (5th Cir.1985), the Fifth Circuit stated, "[t]he law disfavors forfeitures ... and the cancellation of an oil, gas and mineral lease is nothing less than a forfeiture of a recognized protected property interest."